**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL AUDUBON SOCIETY, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES FISH AND WILDLIFE ) | Civil Action No. |
| SERVICE; UNITED STATES ARMY CORPS OF ) | |
| ENGINEERS; SALLY JEWELL, in her official ) | |
| capacity as Secretary, Department of the Interior; ) | |
| DANIEL M. ASHE, in his official capacity as ) | **COMPLAINT FOR** |
| Director, U.S. Fish and Wildlife Service; WENDI ) | **DECLARATORY AND** |
| WEBER, in her official capacity as Northeast ) | **INJUNCTIVE RELIEF** |
| Regional Director, U.S. Fish and Wildlife Service; ) | |
| LIEUTENANT GENERAL THOMAS P. ) | |
| BOSTICK, in his official capacity as Commanding ) | |
| General and Chief of Engineers, U.S. Army Corps ) | |
| of Engineers; and COLONEL PAUL E. OWEN, in ) | |
| his official capacity as New York District ) | |
| Commander, U.S. Army Corps of Engineers, ) | |
| ) | |
| Defendants. ) | |

## INTRODUCTION

1.       Plaintiff National Audubon Society brings this action to prevent the unnecessary

destruction of rare nesting and foraging habitat that is essential to the survival and recovery of

the Atlantic Coast piping plover, a shorebird listed as "threatened" under the Endangered Species

Act.  Specifically, this action challenges, pursuant to the Administrative Procedure Act ("APA"),

5 U.S.C. §§ 701-706, a Biological Opinion issued by the U.S. Fish and Wildlife Service

("FWS") under Section 7(a)(2) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(2),

and an Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI")

issued by the U.S. Army Corps of Engineers ("Corps") under the National Environmental Policy

Act ("NEPA"), 42 U.S.C. §§ 4321-4375, for the Fire Island Inlet to Moriches Inlet Fire Island

Stabilization Project ("FIMI Project" or "Project").

  2.  The FIMI Project will be the largest beach reconstruction project ever attempted

on the south shore of Long Island.  The purpose of the Project is to undo changes to the Fire

Island shoreline caused by Hurricane Sandy, and to purportedly provide protection from future

storms by constructing a series of sand dunes and berms along 19 miles of the Fire Island

shoreline, including approximately three miles of crucial piping plover habitat at two

undeveloped locations: Smith Point County Park and the Fire Island Lighthouse Beach on the

Fire Island National Seashore.  Based on the scope and magnitude of the adverse impacts it

identified, FWS concluded in a preliminary determination that the FIMI Project would

jeopardize the continued existence of the Atlantic Coast piping plover.

  3.  Two weeks after this preliminary determination, FWS transmitted its final

Biological Opinion to the Corps.  Conspicuously absent from the final Biological Opinion is *any*

determination concerning jeopardy to piping plovers.  Rather, the Biological Opinion

acknowledged that the FIMI Project will result in immediate and long-term significant adverse

impacts on piping plover habitat, and that the Project will have profound and long-term negative

effects on the plover's distribution, numbers, and reproduction, but failed to make an explicit

determination concerning jeopardy.  Had FWS concluded in the Biological Opinion that the

FIMI Project would not jeopardize the Atlantic Coast piping plover, that conclusion would not

be supported by the findings in the Biological Opinion.

  4.  The Corps, in turn, conducted an inadequate environmental review of the FIMI

Project under NEPA that ignored key findings set forth in the Biological Opinion concerning

impacts on piping plovers, failed to properly consider the Project's cumulative impacts on piping

plovers, and did not objectively evaluate all reasonable alternatives to the proposed action.  As a result, the Corps issued a FONSI unsupported by the facts in the record.

5.      The actions of FWS and the Corps (jointly, "Defendants") violate the requirements of the ESA, 16 U.S.C. §§ 1531-1544, and NEPA, 42 U.S.C. §§ 4321-4375, and are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. Accordingly, this Court should hold unlawful and set aside FWS's Biological Opinion and the Corps' EA and FONSI.

## JURISDICTION AND VENUE

6.      This action arises under the APA, 5 U.S.C. §§ 701-706; NEPA, 42 U.S.C. §§ 4321-4375; and the ESA, 16 U.S.C. §§ 1531-1544.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States) and 5 U.S.C. §§ 701-706 (judicial review of agency action).

7.      The Court may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202.

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e).

## PARTIES

9.      Plaintiff National Audubon Society, Inc. ("Audubon") is a non-profit organization incorporated in the State of New York that is dedicated to conserving and restoring natural ecosystems, with a focus on birds, other wildlife, and their habitats, for the benefit of humanity and the earth's biological diversity.  Founded in 1905, Audubon is committed to combining science, education, and policy expertise to protect and restore local habitats and to implement policies that safeguard birds, wildlife, and the resources they depend on.  Audubon has approximately 400,000 members across the country and approximately 600 local chapters

nationwide, which engage members in grassroots conservation efforts.  Audubon has 27 local chapters and 27,000 members in New York State, including seven local Audubon chapters on Long Island with 4,500 members.  Audubon has long advocated for the protection of the Atlantic Coast piping plover, particularly on Long Island and Fire Island.  Audubon initially identified the FIMI Project area as an Important Bird Area for piping plovers in 1998 and affirmed that designation again in 2005.  Since 2009, Audubon has employed a full-time biologist to help steward piping plovers on Long Island by installing predator exclosures and string fencing around piping plover nests, and advising beachgoers and managers on how to avoid negative impacts to plovers.

10.     On April 15, 2014, Audubon submitted comments to the Corps on the draft EA for the FIMI Project, pointing out the inadequacy of the EA and urging the Corps to, among other things, base its evaluation of alternatives on the science, to consider additional alternatives, and to incorporate sufficient mitigation measures to offset impacts to piping plovers.  Audubon sent out an Action Alert to members alerting them of the Corps' draft EA, and, in response, 1,615 members submitted comments to the Corps critiquing the EA and the FIMI Project.  On April 16, 2014, Audubon met with Defendant Wendi Weber, FWS Northeast Region Director, to discuss concerns about the impacts of the FIMI Project on piping plovers.  On June 18, 2014, Audubon again submitted comments, this time on the Corps' draft FONSI for the project, noting the need for a full Environmental Impact Statement and critiquing the Corps' failure to consider a range of reasonable alternatives and failure to take a hard look at the FIMI Project's cumulative impacts on the piping plover.  Audubon again sent an Action Alert to its members, and 1,791 individuals responded by submitting their own comments on the draft FONSI to the Corps.

11.     Audubon members study, observe, enjoy, and seek protection for wildlife, including the Atlantic Coast piping plover.  Audubon members live in and/or regularly visit the south shore of Long Island, including Fire Island, where they enjoy viewing and observing the piping plover.  These members derive aesthetic, recreational, and conservation benefit and enjoyment from the existence of the piping plover and will continue to do so by regularly engaging in recreational and conservation activities involving the plover.  Defendants' flawed Biological Opinion, inadequate environmental review, and unsupportable FONSI for the FIMI Project irreparably injure the aesthetic, conservation, recreational, and educational interests of Audubon and its members in the survival and recovery of the Atlantic Coast piping plover. Unless this Court grants the requested relief, these interests will continue to be adversely affected and irreparably harmed by Defendants' failure to comply with the ESA and NEPA.

12.     Defendant FWS is a federal agency within the Department of the Interior that is responsible for administering the provisions of the ESA with regard to certain listed species, including the Atlantic Coast piping plover.

13.     Defendant Sally Jewell, Secretary of the Interior, has oversight authority for all actions taken by FWS.  Defendant Jewell is sued in her official capacity.

14.     Defendant Daniel M. Ashe, Director of FWS, is responsible for ensuring that FWS complies with its obligations under the ESA.  Defendant Ashe is sued in his official capacity.

15.     Defendant Wendi Weber, Director of the Northeast Region of FWS, has oversight authority for the actions taken by FWS in the Northeast Region, which encompasses the state of New York.  The Northeast Region of FWS prepared the Biological Opinion challenged in this action.  Defendant Weber is sued in her official capacity.

5

16.    Defendant Corps is a federal agency within the Department of Defense that proposed and will implement the FIMI Project, undertook the environmental review of the project, and prepared the EA and FONSI challenged in this action.

17.    Defendant Lieutenant General Thomas P. Bostick, the Commanding General and Chief of Engineers of the Corps, has oversight authority for all actions taken by the Corps. Defendant Bostick is sued in his official capacity.

18.    Defendant Colonel Paul E. Owen, Commander of the New York District of the Corps, is responsible for the actions of the Corps' New York District, which is charged with the Corps' water resource activities in an area encompassing eastern and south-central New York State and Long Island.  The New York District of the Corps conducted the challenged environmental review for the FIMI Project, and Defendant Owen signed the FONSI challenged in this action.  Defendant Owen is sued in his official capacity.

## LEGAL BACKGROUND

## I.    THE ENDANGERED SPECIES ACT

19.    The ESA establishes a policy that "all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of [the statute]."  16 U.S.C. § 1531.  Under the ESA, a species is listed as "endangered" when it is "in danger of extinction throughout all or a significant portion of its range."  *Id.* § 1532(6).  A species is listed as "threatened" where it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  *Id.* § 1532(20).

20.    Section 7(a)(2) of the ESA requires that federal agencies, in consultation with the Secretary of Interior, "insure that any action authorized, funded, or carried out by [the] agency

. . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical habitat] . . . ."  16 U.S.C. § 1536(a)(2).  An action jeopardizes the continued existence of a species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.

21.     After consulting with the agency that has proposed the action, the Secretary of the Interior – in this case, FWS[1] – "shall provide" to the action agency "a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat."  16 U.S.C. § 1536(b)(3)(A).  Thus, FWS's Biological Opinion must include, in addition to "[a] summary of the information on which the opinion is based," and "[a] detailed discussion of the effects of the action on listed species," the agency's "opinion on whether the action" is likely to jeopardize or not likely to jeopardize the continued existence of the listed species.  50 C.F.R. § 402.14(h).

22.     In undertaking consultation with an action agency and formulating a Biological Opinion about the impacts of the proposed action on a listed species, FWS is required to "[e]valuate the effects of the action" together with "cumulative effects" on the listed species.  50 C.F.R. § 402.14(g)(3)-(4).  The "effects of the action" encompass "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline."  50 C.F.R. § 402.02.  In undertaking consultation under Section 7 of the ESA, FWS is obligated

---

[1] The Secretaries of the Interior and Commerce – and specifically, FWS and the National Marine Fisheries Service – share program responsibilities under the ESA according to the type of species involved.  16 U.S.C. § 1532(15).  For the piping plover, FWS is the agency responsible for administering the ESA.  50 C.F.R. § 402.01(b).

to "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.14(g)(8).

23.     If FWS concludes, based upon an analysis of these effects, that the proposed action is likely to jeopardize the continued existence of a listed species, it must suggest reasonable and prudent alternatives to the proposed action that it believes would avoid jeopardy. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3).

24.     If FWS concludes that the proposed action is not likely to cause jeopardy but will result in the take of a listed species, it must provide an incidental take statement that must, among other things, specify the impact, "i.e., the amount or extent," of the proposed action's incidental taking on the species, identify "reasonable and prudent measures" that are considered "necessary or appropriate to minimize such impacts," and "set[] forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with . . . to implement" the reasonable and prudent measures. 50 C.F.R. § 402.14(i); 16 U.S.C. § 1536(b)(4). "Take" is defined broadly under the ESA to mean, among other things, "harass [and] harm," 16 U.S.C. § 1532(19), and "harm," in turn, is defined by FWS to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. Take is prohibited under the ESA, *id.* § 1538(a); 50 C.F.R. § 17.31(a), but any take that is in compliance with the terms and conditions set forth in an incidental take statement "shall not be considered to be a prohibited taking." 16 U.S.C. § 1536(o)(2).

25.     A proposed action may include conservation measures, which are "actions to benefit or promote the recovery of [the] listed species that are included by the Federal agency as an integral part of the proposed action" and "serve to minimize or compensate for" the project's

impacts.  U.S. FWS & Nat'l Marine Fisheries Serv., Final ESA Section 7 Consultation

Handbook xii (1998), http://www.fws.gov/endangered/esa-

library/pdf/esa_section7_handbook.pdf ("ESA Handbook").  Conservation measures are

considered part of the proposed action, and their implementation is "required under the terms of

the consultation."  *Id.* at 4-19.  Such measures must be reasonably specific, certain to occur, and

capable of implementation; they must be subject to deadlines or otherwise-enforceable

obligations; and most important, they must address the threat to the species in a way that satisfies

the jeopardy and adverse modification standards.

## II.    NEPA REVIEW REQUIREMENTS

26.    In authorizing the FIMI Project, the Corps is required to comply with NEPA, the

"basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  NEPA serves

the dual purpose of requiring an agency to consider every significant aspect of the environmental

impact of a proposed action and ensuring that the agency informs the public that it has indeed

considered environmental concerns in its decisionmaking process.

27.    Pursuant to NEPA, federal agencies must prepare an Environmental Impact

Statement ("EIS") before approving "major Federal actions significantly affecting the quality of

the human environment."  42 U.S.C. § 4332(C).  An EA is prepared to help determine whether a

proposed activity is a major federal action significantly affecting the quality of the human

environment.  *See* 40 C.F.R. § 1501.4(c).  An EA must "provide sufficient evidence and analysis

for determining whether to prepare an environmental impact statement or a finding of no

significant impact."  *Id.* § 1508.9(a)(1); *see also* 32 C.F.R. § 651.20.

28.    In undertaking its environmental review under NEPA, an agency must disclose

and consider the "environmental consequences" of a proposed action, including its direct,

9

indirect, and cumulative impacts.  *Id.* §§ 1502.16, 1508.25.  Cumulative impacts are those that "result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  *Id.* § 1508.7.

29.     At "the heart" of the environmental review is an analysis of alternatives to the proposed action.  40 C.F.R. § 1502.14; *see also id.* § 1508.9(b).  The agency is required under NEPA to "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed action in order to "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public."  *Id.* § 1502.14; *see also* 32 C.F.R. § 651.9(c).  Department of the Army regulations implementing NEPA further reiterate that in the discussion of alternatives in an EA, "any criteria for screening alternatives from full consideration should be presented, and the final disposition of any alternatives that were initially identified should be discussed."  32 C.F.R. § 651.34(d).

30.     Where an EA shows that a proposed action would have a significant impact on the quality of the human environment, an EIS must be prepared.  *See* 40 C.F.R. §§ 1501.4, 1502.3.  To determine whether significant impacts exist, the agency must consider "both context and intensity."  *Id.* § 1508.27.  A proposed action's significance "must be analyzed in several contexts such as . . . the affected region, the affected interests, and the locality."  *Id.* § 1508.27(a).  Intensity "refers to the severity of impact" and requires evaluation of ten factors, including the unique characteristics of the geographic area, the degree to which the action's possible effects are uncertain, the degree to which the action may set a precedent for future actions with significant effects, whether the action is related to other actions with cumulatively significant impacts, and the degree to which the action may adversely affect a threatened or

endangered species.  *Id.* § 1508.27(b); *see also* 32 C.F.R. § 651.39(b) (indicating that impacts

could be deemed significant where an action would "cause irreparable harm to animal or plant

life").

FACTUAL BACKGROUND

## I.     THE PIPING PLOVER

### A.     Biology and Habitat Needs

31.     Named for its plaintive whistle, the piping plover (*Charadrius melodus*) is a small

shorebird with yellow-orange legs and a black stripe from eye to eye.  Atlantic Coast piping

plovers, one of three distinct breeding populations of piping plovers, breed and nest on beaches

along the Atlantic Coast from April to August, then migrate to their southern wintering habitat

beginning in August.

32.     Piping plovers nest in small depressions, or scrapes, in sandy areas with little or

no vegetation.  The average clutch size is four eggs, and the young hatch about 27 to 31 days

after egg-laying.  Piping plovers generally fledge only a single brood per breeding season.

33.     Piping plovers feed on invertebrates, including worms, fly larvae, crustaceans,

and mollusks.  This food is most abundant in moist sediments such as bayside intertidal zones,

overwash areas, ephemeral pools that collect on the beach, and wrack (organic material

deposited on beaches by the tides).  Plover chicks are not fed by parents, but rather begin

foraging for themselves shortly after hatching.  FWS, Biological Opinion and Conference

Opinion, Fire Island Inlet to Moriches Inlet Fire Island Stabilization Project 55 (May 23, 2014)

("BO").  Because plover chicks cannot fly until approximately 25 to 35 days after hatching, they

forage by walking from the nest site.  *Id.*  Chicks spend a majority of their time foraging and

typically triple their weight during the first two weeks after hatching.  *Id.* at 56.  Those that do

not achieve at least 60 percent of this weight gain by twelve days after hatching are unlikely to survive. *Id.*

34.    Predation and disturbance of nests and chicks by humans and pets are "pervasive and persistent threats" to the piping plover. *Id.* at 50.  Predator species include foxes, cats, dogs, and gulls. *Id.* at 108.

35.    Optimal piping plover breeding habitat consists of wide, relatively flat, sandy, unvegetated or sparsely vegetated beaches with connection to moist substrate habitats, particularly bayside intertidal habitat, where prey are most abundant.  The connection of nesting habitat to foraging habitat is important because it allows unfledged chicks to walk from nesting sites on dry sand, where there is little prey, to areas where they can feed.  This type of optimal piping plover breeding habitat, characterized by wide, flat, sparsely vegetated beaches with access and connection to moist substrates, is an early successional-stage habitat that is naturally created and maintained by storms. *Id.* at 56.  Past experience has demonstrated that local piping plover populations respond positively and rapidly when storms create nesting and foraging habitat in close proximity. *Id.* at 58, 71.

**B.    Current Status and Recovery Plan**

36.    Piping plovers were once common in the 19th century, but the species was decimated as a result of commercial hunting in the 19th century.  In 1986, FWS listed the piping plover as endangered in the Great Lakes watershed and threatened everywhere else in its range. 50 Fed. Reg. 50,726, 50,730 (Dec. 11, 1985).  In reaching that determination, FWS noted that "[t]he primary threats to the piping plover are habitat disturbance and destruction, and disturbance of nesting adults and chicks." *Id.* at 50,726.

37.     The piping plover breeds in the northern Great Plains, in the Great Lakes region, and along the Atlantic Coast.  Each of these three separate breeding populations has its own recovery plan and recovery criteria formulated by FWS.

38.     The Atlantic Coast piping plover population is distributed among four recovery units: Atlantic Canada, New England, New York-New Jersey, and Southern (covering Delaware, Maryland, Virginia, and North Carolina).  The FWS's Recovery Plan establishes the objectives and criteria for the recovery of the Atlantic Coast piping plover population.  *See* FWS, Piping Plover (*Charadrius melodus*) Atlantic Coast Population: Revised Recovery Plan (1996), http://www.fws.gov/northeast/pipingplover/pdf/entire_plan.pdf ("Recovery Plan").  The Recovery Plan sets a recovery goal of 2,000 breeding pairs of piping plovers to be maintained for five years, distributed among the four recovery units as follows: 400 pairs in Atlantic Canada, 625 pairs in New England, 575 pairs in New York-New Jersey, and 400 pairs in Southern.  *Id.* at iii.  The Recovery Plan also sets a goal of a five-year average productivity of 1.5 fledged chicks per breeding pair in each of the four recovery units.  *Id.* at iv.

39.     Piping plover populations in the New York-New Jersey recovery units have significantly declined in recent years.  Since 2007, the New York-New Jersey piping plover population has declined by 32 percent.  As of 2013, the New York-New Jersey recovery unit supported only 397 pairs of piping plovers, BO at 63, which is the lowest abundance of the species in the unit since 2000, *id.* at 73.  Moreover, as of 2013, the productivity of piping plovers in the New York-New Jersey recovery unit reached a record low of 0.74 chicks per breeding pair – well below the replacement rate.  *Id.* at 65.  At present, there are no indications that this downward trend will be reversed soon.  *Id.* at 71-72.  FWS recognizes that reversing the major ongoing decline in the New York-New Jersey recovery unit is "urgent."  *Id.* at 50.

13

40.     Because of the need to conserve genetic diversity and to protect a sparsely distributed species with strict biological requirements, the long-term survival and recovery of the Atlantic Coast piping plover population as a whole depends on the maintenance of geographically well-distributed populations across the four recovery units.  FWS recognized in its Recovery Plan that "the overall security of the Atlantic Coast piping plover population is profoundly dependent upon attainment and maintenance of the minimum population levels for the four recovery units.  Any appreciable reduction in the likelihood of survival of a recovery unit will also reduce the probability of persistence of the entire population."  Recovery Plan at 54.  Thus, if the ongoing precipitous decline in piping plover populations in the New York-New Jersey recovery unit is not arrested and reversed, the persistence of the entire Atlantic Coast piping plover population will be jeopardized.

41.     The FWS's 1996 Recovery Plan recognizes that "[l]oss and degradation of habitat due to development and shoreline stabilization" are "major contributors to the species' decline."  Recovery Plan at iii.  Accordingly, among the "recovery tasks" outlined in the Recovery Plan is that of "[m]aintain[ing] natural coastal formation processes that perpetuate high quality breeding habitat."  *Id.* at 65.  In elaborating on this recovery task, FWS explicitly discouraged "interference with natural processes of inlet formation, migration, and closure" and "beach stabilization projects."  *Id.* at 66, 67.  This is identified in the Recovery Plan as "Priority 1" – that is, actions that "must be taken to prevent extinction or to prevent the species from declining irreversibly in the foreseeable future."  *Id.*  at 100-01.

42.     Due to limited piping plover habitat availability in New Jersey, the south shore of Long Island supports about 50 percent of the entire New York-New Jersey recovery unit population.  BO at 63.  As such, the ability of the New York-New Jersey recovery unit to achieve

14

the FWS's recovery goals depends on the increase of plover abundance on the south shore of Long Island. *Id.* at 147. Because widespread development and beach stabilization projects throughout the New York-New Jersey recovery unit have eliminated or diminished preferred breeding habitat, Fire Island is "pivotal" in providing "existing habitat and the potential for future habitat formation that are key to survival and recovery of the piping plover in the New York-New Jersey recovery unit." *Id.* at 110-11. Indeed, Fire Island "offers the only real opportunities for [preferred breeding] habitats to form relative to most of the south shore of Long Island." *Id.* at 132.

### C.   Optimal Breeding Habitat Created by Hurricane Sandy

43.   In October 2012, Hurricane Sandy created approximately 162 hectares, or 400 acres, of new overwash habitat on Fire Island, including at least 84 hectares, or 207 acres, within the FIMI Project area. *Id.* at 110.

44.   The greatest extent of overwash deposits caused by Hurricane Sandy occurred on the eastern end of Fire Island. Smith Point County Park, which occupies the eastern six miles of Fire Island, now contains three overwash areas, from west to east: an area south of Pattersquash Island, the now closed breach area, and an area south of New Made Island. *Id.* at 15, 18; *id.* at 216-17 (Table 1) (referring to the three overwash areas as Pattersquash, Smith Point Breach, and New Made Island).

45.   In the western portion of the island, the largest area of overwash habitat was formed at the National Park Service's Fire Island Lighthouse Beach. *Id.* at 15, 111. All of this newly created, prime plover habitat is capable of supporting up to 60 pairs of piping plovers – more than double the 27 pairs that inhabited Fire Island in 2013. *Id.* at 110.

**D.      Known Impacts of Beach Stabilization on Breeding Habitat**

46.      The detrimental impacts of beach stabilization activities on piping plover habitat are well-known and uncontroversial. As FWS recognizes, beach stabilization activities result in the "loss and degradation of suitable plover . . . habitats and are major causes to the range-wide decline of the piping plover." *Id.* at 84.  FWS further recognizes that "[s]cientific research conducted on Long Island explicitly recommended avoiding beach management practices (e.g., jetty construction, breach filling, dune building, beach nourishment) that typically inhibit natural renewal of ephemeral pools, bay tidal flats, and open vegetation (Elias *et al.* 2000) and allowing natural storm processes that create habitat to act unimpeded (Cohen *et al.* 2009)." *Id.* at 51.

47.      The burying of existing beaches under dredged material temporarily destroys available prey resources along the coast, while the construction of dunes running parallel to the ocean fragments nesting habitat from optimal foraging habitat and prevents plovers from accessing bayside areas for foraging.  Thus, beach stabilization, which results in artificially created beaches without access to high quality bayside foraging areas, may lead to "population sinks" that recruit plover pairs to the area "only to yield reproduction levels less than one chick per pair[,] which is below the level necessary to achieve a stationary population level." *Id.* at 132.

48.      Apart from diminishing and degrading available habitat and disrupting natural processes that have the potential to create and maintain optimal habitat, beach stabilization activities also exacerbate conflicts with human beach recreation and predators by increasingly constraining nests and chicks to narrow, dry oceanfront habitats where the birds are more exposed and in closer contact with humans and pets. *Id.* at 73, 102, 146.

49. FWS cites "[e]mpirical evidence show[ing] that artificial beach stabilization leads to near-certain loss of piping plover breeding activity" in other recovery units, *id.* at 52, and recognizes that on Fire Island, beach stabilization activities already "have limited habitat area . . . by inhibiting the development of storm-created habitats and degrading foraging habitat that are both necessary for the recovery of the piping plovers," *id.* at 108. Recent survey of beach stabilization projects on Fire Island "showed that these habitats supported low numbers of breeding pairs with limited to no reproductive output, and experience high levels of recreational disturbance and degradation due to off-road vehicle use." *Id.* at 132. In fact, "[o]ver the last 8 years, piping plovers have only temporarily colonized (one season) artificially constructed beaches on Fire Island, with zero productivity." *Id.*

## II.  THE FIMI PROJECT

50. The FIMI Project is a beach stabilization project specifically "designed to substantially reduce or preclude the formation of overwash/breach habitats." *Id.* at 125. The purpose of the FIMI Project is "to prevent the formation of natural barrier island habitats, such as blowouts, overwash fans, large expanses of wide, low slope beaches with variable dune heights and vegetation patterns, as well as bay to ocean habitat connectivity" – ecological features that are essential for piping plover breeding habitat. *Id.* at 127.

51. The FIMI Project area is in the New York-New Jersey recovery unit, where FWS concedes that "artificial coastal stabilization is the primary continuing threat [to piping plovers], causing direct loss and degradation of habitat and indirectly causing disturbance from beach recreation and predation." *Id.* at 109.

52. The project will place approximately seven million cubic yards of dredged sand along 19 miles of the 30-mile Fire Island coastline and involves the construction of dunes and

berms, or berms only, along 4.4 miles of beach habitat within Robert Moses State Park, 8.6 miles of beach habitat within the Fire Island National Seashore, and 5.2 miles of beach habitat in Smith Point County Park. *Id.* at 122.

53.     In Smith Point County Park, the FIMI Project would construct a total of 27,200 feet of dunes and berms – less than a quarter, or 6,400 feet, of which would be placed in front of infrastructure and recreational facilities. *Id.* at 16.  The remaining three-quarters of the berm and dune construction in Smith Point County Park, or 20,800 feet, would be placed on beaches in entirely undeveloped areas of the park. *Id.*

54.     The FIMI Project includes certain conservation measures intended "to avoid or minimize adverse effects" on the piping plover, including habitat restoration intended to increase the quantity of plover habitat and other measures intended to improve the quality and productivity of the existing limited habitat. *Id.* at 16-23, 142-44.

55.     The habitat restoration component of the conservation measures will seek to restore 33.7 hectares of oceanside habitat at Great Gun Beach on the eastern end of Fire Island, as well as 6 hectares of bayside habitat at a dredge disposal site near New Made Island, by clearing vegetation and modifying topography to mimic early successional-stage habitat. *Id.* at 20.  The Corps would also attempt to design and maintain ephemeral pools in the Great Gun area. *Id.* at 141.  FWS has acknowledged that these efforts to engineer habitat to mimic early successional-stage habitat suitable for piping plovers are "experimental." *Id.* at 20.  Indeed, FWS acknowledges the uncertainty concerning the chances of success of its attempt to engineer new plover habitat, stating that subsequent monitoring of these engineered areas is intended to "provide essential information to help [FWS] learn how best to restore these habitats." *Id.* at

142.  The FIMI Project would diminish nesting habitat even if the experimental habitat restoration measures were 100 percent successful.  *See id.* at 148 (Fig. 21).

56.     The Corps would also remove vegetation and attempt to manage bayside habitat in the three overwash areas in Smith Point County Park.  BO at 144, 216-17 (Table 1).  With respect to these conservation measures, FWS acknowledged that there is "no data that documents the use of isolated bay habitats by piping plovers, so [the agency] currently ha[s] no assurances that this area will support nesting pairs of piping plovers."  *Id.* at 129.  The agency concluded that it was "uncertain that these areas would result in observed increases in plover abundance or productivity."  *Id.*

57.     Among the conservation measures intended to "improve the quality and productivity of the available habitat" are a number of vague and speculative measures, some involving third parties beyond the control or authority of the Corps, that are not certain to occur and do not address the FIMI Project's threats to the piping plover.  *Id.* at 142.

58.     For instance, a "new" plover monitoring program is proposed to supplement existing programs that monitor plovers across Fire Island.  *Id.*  This program would involve coordination between the Corps, FWS, the National Park Service, the New York State Department of Environmental Conservation, and Suffolk County.  *Id.* at 21.  However, the Biological Opinion fails to explain how this monitoring supplements or provides additional benefits beyond the plover monitoring program that already is conducted annually on Fire Island, and there are no deadlines or otherwise enforceable obligations by any agency or entity to undertake this "new" monitoring.

59.     Another conservation measure, a predator management strategy to be "coordinated between all agencies and the affected land owners/managers," again includes no

19

enforceable commitment by any of the allegedly involved entities to undertake this yet-to-be-formulated strategy.  *Id.* at 142, 152.

60.     Yet another conservation measure identified as "Coordinated Stewardship/Visitor Management" would involve "[a]ttempts . . . to eliminate or reduce human disturbance to plovers" but does not require any action beyond what is already occurring at beaches on Fire Island.  *Id.* at 143.  Similarly, one conservation measure reiterates that existing federal guidelines for off-road vehicle use "will continue to be followed in the future."  *Id.*  Thus, neither of these conservation measures will result in any additional protections for piping plovers or their habitat.

61.     Another conservation measure involves undertaking effectiveness monitoring and adaptive management.  *Id.* at 144.  However, no effectiveness monitoring or adaptive management plans have been developed.

62.     The conservation measures are substantially the same as the reasonable and prudent measures identified in the Incidental Take Statement to minimize impacts of the anticipated take of piping plovers.  *Id.* at 150-51.

63.     The EA indicates that the first phase of construction of the FIMI Project will begin in September of 2014 in Smith Point County Park.  *See* Corps, Fire Island Inlet to Moriches Inlet Fire Island Stabilization Project: Final Environmental Assessment 22 (June 2014).  The second phase of construction will begin in November 2014 in a stretch of Fire Island that includes the Fire Island Lighthouse Beach.  *See id.*

III.     **FWS'S BIOLOGICAL OPINION**

64.     Formal consultation for the FIMI Project pursuant to ESA § 7(a)(2) officially began on March 4, 2014.

65.     On May 7, 2014, during an interagency meeting, FWS communicated its preliminary determination that the FIMI project "was likely to jeopardize the continued existence of the piping plover."  BO at 9.  At this meeting, FWS explained how its jeopardy determination was based on "the status of the species, environmental baseline, effects of the action, and cumulative effects of the project."  *Id.*

66.     A draft Biological Opinion produced in response to a Freedom of Information Act request stated FWS's opinion that the FIMI Project "is likely to jeopardize the continued existence of the threatened Atlantic Coast population of the piping plover" because it "is likely to measurably impair" the New York-New Jersey recovery unit from achieving the abundance and productivity targets set forth in the 1996 Recovery Plan.  This document was labeled with a May 20, 2014 date.

67.     On May 23, 2014, a final Biological Opinion was delivered to the Corps.  The final Biological Opinion states no actual opinion from FWS that the Project will not jeopardize the piping plover.  *See id.* at 144-149 ("Conclusion" section of the Biological Opinion relating to piping plovers).  At most, a sentence in the Incidental Take Statement alludes to a determination "[i]n the accompanying biological opinion" that the "level of anticipated take is not likely to result in jeopardy to the species."  BO at 150.

     A.     **Findings Concerning the Impacts of the FIMI Project**

68.     Despite its purported no-jeopardy determination, the Biological Opinion acknowledges that the FIMI Project will "result in both immediate and long term effects to [piping plover] habitat and the species distribution, numbers and reproduction in the wild, with ramifications to the Fire Island breeding unit, the south shore of Long Island, and the New York – New Jersey recovery unit as a whole."  *Id.* at 122.

21

69.     The Biological Opinion goes on to specifically identify the profound negative biological and habitat-related effects of the FIMI Project:

> The destruction and modification of both foraging, nesting, and brood-rearing habitats resulting from the proposed action is likely to result in (1) reduction and eventual displacement of plovers from one or more existing Fire Island breeding sites; (2) higher mortality rates, delayed breeding, reduced nesting success and lower survivorship of fledglings as a result of displacement; (3) the loss of potential "source" breeding populations that may maintain, in part, through emigration, other plover populations; (4) the fragmentation of, and decline in, plover populations region-wide, and (5) increased habitat loss and fragmentation on a local and regional scale.

*Id.* at 125.

70.     The Biological Opinion recognizes that "[a]ll current sub-populations of breeding plovers and occupied habitat on Fire Island, totaling about 26 pairs, would be impacted by the proposed project." *Id.* The Biological Opinion also references "[s]imulations of future plover populations on Fire Island and the south shore of Long Island" that "suggest a higher probability of decreasing populations and extinctions with the FIMI project than without it." *Id.* at 124.

71.     FWS found "that impacts of the proposed project may include, but are not limited to, the loss and fragmentation of preferred bay to ocean overwash habitats, loss and degradation of partial overwash habitats, reduction in foraging habitats on bayside beaches, destruction of plover prey resources for at least one breeding season on oceanside beaches, increased predators, and increases in recreational disturbance (pedestrians and [off-road vehicles])." *Id.* at 125.

72.     FWS estimated the FIMI Project's impacts on nesting pair density under an "optimal" and an "alternative" scenario. *Id.* at 130-31. Regardless of the scenario, however, FWS conceded that the project will result in a reduction in overall nesting capacity caused largely by the fragmentation and degradation of preferred habitats through the construction of artificial dunes. *Id.* at 131.

73.     FWS also concluded that the project would "likely impact foraging habitat and prey resources" in a way that is "neither short-term nor localized," exacerbate conflicts between plovers and human recreational activities thereby causing increased mortality and disturbance to plovers and their chicks, and make plovers more susceptible to predation by mammalian and avian predators.  *Id.* at 135-39.

74.     The Biological Opinion  acknowledged that the Recovery Plan specifically discourages beach stabilization projects and referenced scientific research that "explicitly recommended avoiding beach management practices (e.g., jetty construction, breach filling, dune building, beach nourishment)," as well as scientific research emphasizing the importance of "allowing natural storm processes that create habitat to act unimpeded."  *Id.* at 83.  Recognizing that the FIMI Project "would affect all existing overwash areas and would impair the formation of new overwash habitats within the project area" – areas that are the preferred habitat of the piping plover – FWS concluded that the FIMI Project "would result in short- and long-term changes to plover nesting, foraging, and chick rearing habitats, ultimately affecting the species' numbers, distribution, and reproduction in the wild."  *Id.* at 12.

75.     The Biological Opinion cited scientific studies in stating that "annual losses of preferred habitats due to shoreline stabilization and development has been shown to elicit steep declines in plover abundance, productivity, and distribution," and concluded that "similarly, the proposed project would be expected to have negative effects on local and regional population levels."  *Id.* at 128.  Thus, the Biological Opinion clearly recognized that the FIMI Project will prolong and contribute to the downward spiral in piping plover populations within the New York-New Jersey recovery unit.

### B.      Quantification of Incidental Take

76.      FWS's quantification of the FIMI Project's incidental take relied on assumptions that habitat restoration in the Great Gun site would succeed in the site, hosting 0.75 pair of plovers per hectare, and that restoration in the New Made Island site would result in 0.25 pair of plovers per hectare.  *Id.* at 148.

77.      FWS assumed a 0.75 pair/hectare estimate for the Great Gun restoration area despite its recognition that such habitat restoration efforts were "experimental."  *Id.* at 20.  As Audubon pointed out in its comments on the draft FONSI, past attempts to create ephemeral pools to improve the quality of foraging habitat quality have proven unsuccessful, and the surface elevation of the Great Gun restoration area above the water table suggest that the pools proposed for Great Gun are not likely to hold water and therefore will not be successful in improving foraging habitat quality.

78.      Similarly, FWS assumed a 0.25 pair/hectare estimate for the New Made Island restoration area despite its recognition that it had "no data that documents the use of isolated bay habitat by piping plovers."  BO at 129.  FWS concedes that "[f]urther analysis or examples of bayside habitat are needed to determine the effectiveness of these [isolated bayside] habitats in supporting piping plovers."  *Id.*

## IV.     THE CORPS' EA AND FONSI

79.      The Corps prepared a Final EA dated June 2014, and a FONSI dated July 3, 2014. The determination of no significant impacts in the FONSI was purportedly based on five factors, including that implementation of the FIMI Project would result in "no unacceptable adverse cumulative or secondary impacts," and that "[n]o additional long term adverse impacts to the environment would be associated with the proposed project."

80.     The EA, in notable contrast to the findings set forth in the Biological Opinion and without any apparent scientific basis, concluded that the FIMI Project's alteration to existing plover habitats could be *positive or negative*. EA at 94. The EA ignores the vast majority of findings in the Biological Opinion concerning the significant decline in the piping plover population in the New York-New Jersey recovery unit, the urgent need to recover this population, and the demonstrated harm to plover habitat from beach stabilization projects, and instead blithely asserts that the FIMI Project could create positive habitat conditions by making more beach available to plovers. *See id.* at 92-94.

81.     In the Cumulative Impacts section, the EA lists seven other federal projects in the area. *Id.* at 101. The EA does not include among these the Fire Island to Montauk Point Project, even though the Corps' Biological Assessment notes that this project "is undergoing study and proposed for implementation in the near future" and "could result in additional beach nourishment efforts along Long Island."

82.     The EA also fails to include in its cumulative impacts analysis other federal and non-federal actions that have been and are likely to be taken to address storm damage reduction and beach erosion. These include annual activities by local governments and non-governmental groups that are likely to continue, including periodic beach fills and beach scraping, the Interim Breach Contingency Plan, and several shoreline and jetty stabilization projects listed in the BO. EA at 14-15; BO at 87-98.

83.     The EA's cumulative impact analysis of the FIMI Project concludes that "the cumulative impacts of the Federal projects in the Study Area are uncertain." EA at 102. The EA does not even attempt to quantify or analyze the potential cumulative impacts of the many federal and non-federal actions in the area.

84.     The EA considered only two alternatives: the No Action Alternative and the FIMI Project.  The EA did not identify any criteria for screening alternatives from full consideration.

85.     In a December 13, 2013, letter to the Corps, FWS proposed several alternatives to the proposed FIMI Project that would "provide[] a level of storm damage protection to some of the most critically affected shoreline areas but . . .  also avoid[] jeopardy" to the piping plover.  Among the proposals was a shifting of the dune alignment in the Federal Lighthouse Tract northward to lie adjacent to the Fire Island National Seashore's western access road.  According to the FWS, "[t]his alignment will provide protection to the road and existing infrastructure but allow the naturally created overwash habitats to undergo natural succession."  FWS also recommended the elimination of the proposed dunes in Smith Point County Park west of Pattersquash Island, as "the construction of an artificial dune in this area would effectively eliminate the possibility of any bay to ocean overwash habitats [(optimal plover habitat)] . . . in areas where barrier island infrastructure is not a concern."

86.     In a January 9, 2014, letter to the Corps, FWS reiterated its "primary recommended alternative" to implement the project without building any solid dunes at Smith Point County Park.  FWS also identified "other possible alternatives" for the Smith Point County Park area that could diminish impacts to piping plover habitat while simultaneously providing storm protection, including a "staggered dune" approach, fewer dunes, or breaks in the dunes at Smith Point County Park.

87.     In a January 24, 2014, letter to the Corps, the Department of Interior once again reiterated that "[t]he Alternatives section should be expanded beyond the [FIMI Project], and include additional justification and supporting analyses."  FWS reminded the Corps in that letter of the "several reasonable additional alternatives" it had proposed in its December 13, 2013, and

January 9, 2014, letters and urged consideration of these alternatives in the NEPA analysis "[i]n order to fully comply with the requirements of NEPA."

88.     The EA does not include the alternatives proposed by FWS, nor does the EA provide a reasoned explanation, supported in the record, for the Corps' rejection of FWS's proffered alternatives.

89.     The EA's analysis of the No Action Alternative focuses nearly exclusively on the purported negative ramifications of this alternative without providing the necessary scientific support for its assertions.  A central premise in the Corps' evaluation of the No Action Alternative is that the post-Hurricane Sandy status quo will increase Fire Island's vulnerability to breaching by a future storm, which would in turn result in inundation of bayshore areas on the mainland.

90.     The U.S. Geological Service ("USGS") disputed this premise and in a January 24, 2014 letter, criticized the Corps' overstatement of the flooding risks associated with the No Action Alternative, the lack of data presented to support these claims, and the Corps' failure to rely on "[c]urrent and existing published research related to the evolution/dynamics of the Project area."  Letter from Andrew L. Raddant, Regional Envtl. Officer, U.S. Dep't of the Interior, to Colonel Paul E. Owen, District Eng'r, the Corps 9 (Jan. 24, 2014).  The USGS emphasized to the Corps that overwash and breaching of barrier islands are "fundamental natural processes" that are "critical to the long-term resiliency of barrier islands."  *Id.*

91.     The EA similarly failed to include a rigorous and objective evaluation of the FIMI Project.  Most fundamentally, and as repeatedly pointed out by other federal agencies, the EA does not clearly state the incremental benefit offered by the FIMI Project – that is, the level of risk reduction this alternative is expected to provide above and beyond the No Action

Alternative.  In its comments on the draft EA, which were unaddressed in the final EA, the

USGS noted its "primary concern" that "nowhere in the text are there solid definitions of what

the level of the hazard is and how much the proposed project will mitigate these hazards."  The

USGS emphasized that "[o]verwash and breaching are key, critical processes . . . and therefore

slowing or stopping these processes does not lead to stabilization of the island."  It called for an

explanation in the EA "why the Project proposes to engineer coastal areas that the most current

research demonstrates are stable."

**FIRST CAUSE OF ACTION**
**Violation of APA and ESA by FWS**
(Failure to State Opinion Concerning Jeopardy)

92.     Plaintiff hereby realleges and incorporates each and every allegation in

paragraphs 1 through 91.

93.     In violation of the ESA, 16 U.S.C. § 1536(b)(3)(A), and the FWS regulations, 50

CFR §§ 402.14(h), the Biological Opinion contains no explicit determination setting forth the

Secretary's opinion whether the FIMI Project is likely to jeopardize the Atlantic Coast piping

plover.

94.      FWS's Biological Opinion consequently is arbitrary, capricious, an abuse of

discretion, and not in accordance with law.  5 U.S.C. § 706(2)(A).

**SECOND CAUSE OF ACTION**
**Violation of APA and ESA by FWS**
(Flawed Jeopardy Analysis)

95.     Plaintiff hereby realleges and incorporates each and every allegation in

paragraphs 1 through 91.

96.     In the alternative, if FWS in fact made a "no jeopardy" determination, a

conclusion that the FIMI Project will not jeopardize the continued existence of the piping plover

28

is contradicted by the numerous significant adverse impacts of the FIMI Project identified in the Biological Opinion. A determination that the FIMI Project will not result in jeopardy to the Atlantic Coast piping plover therefore has no factual or analytical basis in the Biological Opinion and is not rationally connected to the facts found in the Biological Opinion.

97.     FWS's no jeopardy determination is arbitrary, capricious, an abuse of discretion, and not in accordance with law.  5 U.S.C. § 706(2)(A).

### THIRD CAUSE OF ACTION
### Violation of APA and ESA by FWS
(Flawed Quantification of Incidental Take)

98.     Plaintiff hereby realleges and incorporates each and every allegation in paragraphs 1 through 91.

99.     FWS did not offer a rational explanation for its calculation of the FIMI Project's incidental take that is supported by facts in the record and based on "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.14(g)(8).

100.     FWS's quantification of incidental take caused by the FIMI Project is consequently arbitrary, capricious, an abuse of discretion, and not in accordance with law.  5 U.S.C. § 706(2)(A).

### FOURTH CAUSE OF ACTION
### Violation of APA and ESA by FWS
(Flawed Reliance on Conservation Measures)

101.     Plaintiff hereby realleges and incorporates each and every allegation in paragraphs 1 through 91.

102.     The Biological Opinion improperly relies on conservation measures that are lacking in detail, unenforceable, not certain to occur, and not related to any clearly articulated goal or benefit to the species.

29

103.    FWS's reliance on such conservation measures in its Biological Opinion is arbitrary, capricious, an abuse of discretion, and not in accordance with law.  5 U.S.C. § 706(2)(A).

## FIFTH CAUSE OF ACTION
## Violation of APA and NEPA by the Corps
### (Arbitrary and Capricious Analysis of Impacts)

104.    Plaintiff hereby realleges and incorporates each and every allegation in paragraphs 1 through 91.

105.    Without any scientific basis or support in the record, the EA ignores key findings in the Biological Opinion concerning the significant adverse impacts of the FIMI Project on piping plovers.

106.    The Corps' analysis of impacts to piping plovers is not rationally connected to the facts and is consequently arbitrary, capricious, an abuse of discretion, and not in accordance with law.  5 U.S.C. § 706(2)(A).

## SIXTH CAUSE OF ACTION
## Violation of APA and NEPA by the Corps
### (Failure to Undertake Proper Alternatives Analysis)

107.    Plaintiff hereby realleges and incorporates each and every allegation in paragraphs 1 through 91.

108.    The EA analyzes only the No Action Alternative and the FIMI Project, without providing a reasoned explanation for the rejection of other alternatives proffered by sister agencies.  The EA also does not rigorously explore and objectively evaluate either the No Action Alternative or the FIMI Project.  The EA thus fails to "[r]igorously explore and objectively evaluate all reasonable alternatives," as required by NEPA.  40 C.F.R. § 1502.14(a); *see also id.* § 1508.9(b).

30

109.     The Corps' failure to consider any reasonable alternatives to the proposed FIMI

Project and to rigorously and objectively assess the No Action Alternative and the FIMI Project

is arbitrary and capricious, an abuse of discretion and not in accordance with law.  5 U.S.C. §

706(2)(A).

## SEVENTH CAUSE OF ACTION
### Violation of APA and NEPA by the Corps
(Failure to Consider Cumulative Impacts)

110.     Plaintiff hereby realleges and incorporates each and every allegation in

paragraphs 1 through 91.

111.     The EA's cumulative impacts analysis fails to identify and analyze the impacts of

several past, present, and reasonably foreseeable federal and non-federal actions in the proximity

of the FIMI Project and also fails to adequately consider the cumulative impacts of the seven

federal beach stabilization projects that it does identify.  *See* 40 C.F.R. § 1508.7.

112.     The Corps' failure to consider cumulative impacts as required by NEPA is

arbitrary and capricious, an abuse of discretion and not in accordance with law.  5 U.S.C. §

706(2)(A).

## EIGHTH CAUSE OF ACTION
### Violation of APA and NEPA by the Corps
(Failure to Prepare an EIS)

113.     Plaintiff hereby realleges and incorporates each and every allegation in

paragraphs 1 through 91.

114.     The Corps' FONSI is unsupported by the record, which documents the integral

ecological importance of Fire Island to the recovery of the piping plover, the precedent-setting

nature of the FIMI Project, the significant cumulative impacts of the Project, the level of

uncertainty associated with the Project's conservation measures, and the degree to which the Project will adversely affect the survival and recovery of the threatened piping plover.

115.    Accordingly, the Corps' issuance of a FONSI and failure to prepare an EIS is arbitrary, capricious, an abuse of discretion, and not in accordance with law.  5 U.S.C. § 706(2)(A).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants as follows:

1.    Declaring FWS's Biological Opinion arbitrary and capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A);

2.    Declaring the Corps' EA and FONSI arbitrary and capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A);

3.    Annulling and vacating the portions of FWS's Biological Opinion that (i) conclude that the FIMI Project will not jeopardize the piping plover, (ii) calculate the incidental take associated with the FIMI Project, and (iii) identify conservation measures for the FIMI Project, and remanding the matter to FWS for a Biological Opinion in compliance with the APA and ESA;

4.    Annulling and vacating the EA and FONSI and remanding the matter to the Corps for an environmental review in compliance with the APA and NEPA;

5.    Preliminarily enjoining the Corps from undertaking, either directly or indirectly, or causing or allowing contractors of defendants to undertake, the destruction or modification of upland areas, beaches, intertidal areas, tidal flats, ephemeral pools, and shorelines at Smith Point County Park and Fire Island Lighthouse Beach on Fire Island, Suffolk County, New York,

including the construction of dunes, berms or roads, the operation of motorized equipment, and any other activity that alters or may have the effect of altering, either temporarily or permanently, the physical condition of the aforementioned areas;

6. Permanently enjoining the Corps from constructing the FIMI Project until such time as a Biological Opinion, EA, and FONSI in compliance with the law are issued by Defendants;

7. Awarding Plaintiff its reasonable fees, costs, and expenses, including attorneys' fees and expert witness fees associated with this litigation; and

8. Granting Plaintiff such further and additional relief as the Court deems just and proper.

Respectfully submitted this 12th day of September, 2014,

/s/ Hannah Chang
Hannah Chang
Christopher Amato
Earthjustice
48 Wall Street, 19th Floor
New York, NY 10005
212-845-7382
hchang@earthjustice.org
camato@earthjustice.org

Katherine E. Ghilain
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022
212-715-1785
Katherine.Ghilain@aporter.com

*Counsel for Plaintiff National Audubon Society*