UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
NATIONAL AUDUBON SOCIETY, INC.,

Plaintiff,

-against-

**OPINION & ORDER**
**14-CV-5341 (SJF)(SIL)**

UNITED STATES FISH AND WILDLIFE
SERVICE; UNITED STATES ARMY CORPS
OF ENGINEERS; SALLY JEWELL, in her
official capacity as Secretary, Department of the
Interior; DANIEL M. ASHE, in his official
capacity as Director, U.S. Fish and Wildlife
Service; WENDI WEVER, in her official
capacity as Northeast Regional Director, U.S.
Fish and Wildlife Service; LIEUTENANT
GENERAL THOMAS P. BOSTICK, in his
official capacity as Commanding General and
Chief of Engineers, U.S. Army Corps of
Engineers; and COLONEL PAUL E. OWEN,
in his official capacity as New York District
Commander, U.S. Army Corp of Engineers,

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★ OCT 1 7 2014 ★

**LONG ISLAND OFFICE**

Defendants.
----------------------------------------------------------X
FEUERSTEIN, J.

I.    Introduction

On September 12, 2014, plaintiff National Audubon Society, Inc. ("plaintiff") filed: (1) a

complaint pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, against

defendants United States Fish and Wildlife Service ("FWS"); United States Army Corps of

Engineers ("Army Corps"); Sally Jewell, in her official capacity as Secretary of the United States

Department of the Interior ("DOI"); Daniel M. Ashe, in his official capacity as Director of the

FWS; Wendi Wever, in her official capacity as Northeast Regional Director of the FWS;

1

Lieutenant General Thomas P. Bostick, in his official capacity as Commanding General and Chief of Engineers of the Army Corps; and Colonel Paul E. Owen, in his official capacity as New York District Commander of the Army Corps (collectively, "defendants"), challenging (a) a Biological Opinion issued by the FWS under Section 7(a)(2) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(2), on or about May 23, 2014 ("the Biological Opinion"), and (b) a final Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") issued by the Army Corps under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4375, relating to the Fire Island Inlet to Moriches Inlet Fire Island Stabilization Project ("the Project"); and (2) an application pursuant to Rule 65 of the Federal Rules of Civil Procedure seeking a temporary restraining order and preliminary injunction enjoining defendants "from undertaking, either directly or indirectly, or causing or allowing [their] contractors * * * to undertake, the destruction or modification of upland areas, beaches, intertidal areas, tidal flats, ephemeral pools, and shorelines at Smith Point County Park and Fire Island Lighthouse Beach ["Lighthouse Beach"] on Fire Island, Suffolk County, New York, including the construction of dunes, berms or roads, the operation of motorized equipment, and any other activity that alters or may have the effect of altering, either temporarily or permanently, the physical condition of the aforementioned areas [pending a ruling on plaintiff's motion for a preliminary injunction and during the pendency of this action, respectively]." (Order to Show Cause for Temporary Restraining Order and Preliminary Injunction ["OTSC"] at 2-3). By order dated September 12, 2014, *inter alia*: (1) defendants were ordered to show cause, by filing a memorandum in response to the plaintiff's application and any supporting evidence on or before September 18, 2014, why the preliminary injunction should not be issued; and (2) plaintiff's application for a temporary

2

restraining order ("TRO") was granted upon its posting of an undertaking in the amount of ten thousand dollars ($10,000.00) pursuant to Rule 65(c) of the Federal Rules of Civil Procedure. Plaintiff posted the required undertaking on September 15, 2014.

Subsequently, defendants moved, *inter alia*, to dissolve the TRO pursuant to Rule 65(d)(4) of the Federal Rules of Civil Procedure and to extend the briefing schedule for the preliminary injunction motion. By order dated September 17, 2014, defendants' motion was granted to the extent that their time to serve and file opposition to plaintiff's preliminary injunction motion was extended to October 2, 2014 and plaintiff's time to serve and file any reply was extended to October 6, 2014. Thereafter, plaintiff moved pursuant to Rule 408 of the Federal Rules of Evidence to strike certain paragraphs and exhibits of the Declaration of F. Franklin Amanat, dated September 16, 2014, submitted by defendants in support of their motion to dissolve the TRO ("the Amanat declaration").

Also pending before the Court is the motion of Fire Island Lighthouse Preservation Society ("FILPS") for leave to file a brief amicus curiae in opposition to plaintiff's motion for a preliminary injunction.

For the reasons set forth herein, all of the above referenced motions are denied.

.

II.     Background

    A.     Factual Background

        1.     The Project

The Project area stretches from Robert Moses State Park in the west to Smith Point County Park ("the Park") in the east, for a total of nineteen (19) miles, on Fire Island, New York.

(Biological Opinion ["Bio. Op."] at 10). The Project includes "dune and beach construction * * * [and] beach fill tapers (lateral extensions of dune and beach fill)" on Fire Island. (Bio. Op. at 5). The stated purpose of the Project is "to address shoreline erosion on Fire Island that occurred as a result of Hurricane Sandy ["the storm"] and to provide a level of storm damage protection to mainland developments * * *." (Id. at 10). Specifically, "[t]he storm created three breaches and extensive overwash areas on the eastern end of Fire Island," (id. at 11), particularly in the Park. (Id.)

### 2.    Consultation

On or about December 9, 2013, the Army Corps transmitted to the FWS the plan layout designs for the Project. (Bio. Op. at 5).

On or about December 13, 2013, the FWS provided recommendations to the Army Corps "to avoid or minimize impacts to listed and proposed species and their habitats[,]" (Bio. Op. at 5)[1], including changes in dune alignment and beach elevation at, *inter alia*, Lighthouse Beach in order "to maximize protection of partial overwash habitats at [that] site[]," (id.); "a 'Berm only' design profile and maximum berm elevation of 9 feet (ft) National Geodetic Vertical Datum (NGVD) at [the Park] in [certain] area[s]," (id.), i.e., elimination of "the proposed artificial dune system in [the Park]," (Chang Decl., Ex. 5 at 2); "sediment textural compatability, (Bio. Op. at 5); and "vegetation density[,]" (id.).

---

[1]  The letter itself indicates that its purpose "is to provide early recommendations for discussion at the meeting scheduled for December 18, 2013, between [FWS and Army Corps] staff to advance habitat restoration and to identify endangered species conservation measures." (Declaration of Hannah Chang, Esq. in Support of Motion for [TRO] and Preliminary Injunction, dated September 11, 2014 ["Chang Decl."], Ex. 5 at 1).

On or about December 16, 2013, the Army Corps transmitted to the FWS a preliminary Draft Environmental Assessment ("Draft EA"), including two (2) alternatives, i.e., a "No Action Alternative" and a "Beach Fill Alternative," that did not include a biological assessment for piping plovers because it was "being revised based on the December 13, 2013[] meeting." (Bio. Op. at 5-6).

On or about December 18, 2013, the Army Corps convened a meeting with the FWS, National Park Service ("NPS"), New York State Department of Environmental Conservation ("NYDEC"), Suffolk County Department of Parks, Recreation and Conservation ("SCDPRC") and Suffolk County Department of Public Works ("SCDPW") "to discuss endangered species conservation measures and habitat restoration alternatives in the proposed [P]roject area." (Bio. Op. at 6). The Biological Opinion indicates that at that meeting, the Army Corps "slightly modifie[d] the dune alignment at [Lighthouse Beach] * * * to address the [FWS's] December 13, 2013[] comments[;] * * * propose[d] to lower tolerance limits for berm elevation to 0.5 ft from 1.0 ft[;] [and] propose[d] several options for vegetation maintenance throughout the [P]roject area[] and habitat restoration near the east end of [the Park] in an area known as Great Gun Beach." (Id.)

On or about December 19, 2013, the Army Corps provided the FWS "its final proposed dune and berm alignment for the [Park] portion of the [P]roject area[,]" including modifications for "dune and beach construction, vegetation maintenance in piping plover breeding habitat, and habitat restoration at the eastern end of [the Park]," (Bio. Op. at 6), "based upon feedback the [Army] Corps received during * * * [the December 18, 2013] meeting * * *." (Chang Decl., Ex. 6).

On or about January 9, 2014, the FWS transmitted correspondence to the Army Corps, *inter alia*, concurring with the Army Corps that the modifications adopted by it "are an improvement over [its] earlier proposed plan and impact less habitat than the earlier proposal," (Chang Decl., Ex. 6), but "identifying additional alternatives the [Army] Corps should consider for the [Park] portion of the project area," (Bio. Op. at 6), to "further diminish the impacts to habitat and provide storm protection[,]" (Chang Decl., Ex. 6). Those additional alternatives include "construct[ion] of an enhanced berm" only, with "no solid dune," at the Park; an "experimental" "'staggered dune' approach at [the Park] that would consist of two lines of dunes with overlapping staggered openings[;]" not having a dune constructed through "at least one of the three overwash lobes[;]" and having "breaks in the dunes[.]" (Id.) The FWS indicated, *inter alia*, that "[a]lthough [it] appreciate[s] monitoring and adaptive management of vegetation in specific [Park] areas, preserving the[] ocean-to-bay overwash lobes is most likely to provide the most recovery benefits." (Id.)

On or about January 10, 2014, the Army Corps provided the FWS with "updated project plans for a portion of the [P]roject at [the Park] * * * advis[ing] that the constructed dunes must be straight lines, with as shallow transitions as possible, but they can be modified during the Plans & Specification period of project planning[] * * * [and] that the back slope of the dune design can be modified slightly * * * for a 'smaller' overall foot print." (Bio. Op. at 6).

On or about January 24, 2014, the DOI, Office of Environmental Policy and Compliance ("OEPC") submitted written comments and suggestions on the Draft EA, including comments from the United States Geological Survey ("USGS"), the NPS and the FWS, to the Army Corps. (Bio. Op. at 6; Chang Decl., Ex. 7).

On or about February 4, 2014, *inter alia*, the FWS received the Army Corps's Biological Assessment ("BA") and request for initiation of formal consultation pursuant to section 7 of the ESA for, *inter alia*, the piping plover. (Bio. Op. at 7).

On or about February 7, 2014, the Army Corps informed the FWS: (1) "that no beach fill will be placed within 1000 meters (m) of known populations of piping plover * * * during the breeding season[,]" (Bio. Op. at 7); and (2) that it expects "the effects of the [Project] will provide storm damage protection for approximately five years and then erode over the next five years to a point where it would not provide storm damage protection." (Bio. Op. at 7).

On or about February 12, 2014, the FWS met with the Army Corps, DOI, NPS and USGS to discuss the Project, the Army Corps's ESA responsibilities and the schedules for the BA and Biological Opinion. (Bio. Op. at 7).

On or about February 14, 2014, the FWS transmitted written comments to the Army Corps on, *inter alia*, the Project design. (Bio. Op. at 7).

Between February 20-21, 2014, a meeting, attended by the FWS, Army Corps, NPS and USGS, was held to discuss, *inter alia*, "the proposed [P]roject in more detail, looking at [P]roject features that would minimize impacts to listed species in the [P]roject area." (Bio. Op. at 8).

On or about February 28, 2014, the Army Corps transmitted, *inter alia*, a revised BA to the FWS, (Bio. Op. at 8), modifying its original BA to increase habitat in the Great Gun Area at the Park to be "managed for piping plovers to mitigate effects of [the Project]" from almost sixteen (15.7) hectares to nearly thirty-four (34) hectares, (Bio. Op. at 141), and to implement an additional six (6) hectare dredge site restoration on the bay side of the Park, south of New Made Island, to be "designed and managed to provide nesting and foraging habitat for plovers," (id. at

7

142).

On or about March 3, 2014, the Army Corps transmitted to the FWS, *inter alia*, its determination that the Project "may affect, and would be likely to adversely affect the piping plover * * *." (Bio. Op. at 8).

On or about March 4, 2014, (1) biologists from the FWS and Army Corps discussed the Project "and several areas where clarification in the [P]roject description [was] needed[,]" (Bio. Op. at 8); (2) the Army Corps "follow[ed] up via electronic correspondence addressing such issues as local maintenance of the [P]roject, land use management that might occur in the [P]roject area after construction, and [its] commitment to continue to work with the [FWS] on issues related to predator management and pre-, concurrent, and post- construction monitoring in the [P]roject area[,]" (id.); and (3) the FWS transmitted to the Army Corps correspondence accepting the BA, thereby officially beginning the process of formal consultation under the ESA. (Id.)

On or about May 7, 2014, a meeting, attended by, *inter alia*, the Army Corps, the NPS, the FWS, the NYSDEC and Suffolk County, was held "to discuss the County's proposed changes to the [Army] Corps's proposed [P]roject description for the area in [the Park] and * * * the [FWS's] draft biological opinion[] * * * preliminar[ily] determin[ing] that the [P]roject, as proposed, was likely to jeopardize the continued existence of the piping plover * * *." (Bio. Op. at 9). The FWS explained that its preliminary determination was based upon "the status of the species, environmental baseline, effects of the action, and cumulative effects of the [P]roject, as well as the regulatory standard required when undertaking jeopardy analyses." (Id.)

On or about May 8, 2014, a meeting attended by the Army Corps, the NPS, the FWS, the

NYSDEC and Suffolk County, was held "to solicit comments on the [FWS's] methodology in evaluating the effects of the [Project], including an assessment of the carrying capacity of storm-created habitats affected versus those not affected by the proposed [P]roject and the with-[P]roject scenario." (Bio. Op. at 9).

Between May 15-16, 2014, a meeting, attended by the Army Corps, the NPS, the FWS, the DOI, the NYSDEC and Suffolk County, was held "to finalize conservation measures to minimize impacts to the piping plover." (Bio. Op. at 9).

On May 23, 2014, the FWS delivered its final biological opinion ("the Biological Opinion") to the Army Corps. (Bio. Op. at 9).

### 3. The Biological Opinion

The Biological Opinion is based upon information provided in the Army Corps's final revised BA (Bio. Op. at 4, 12), and numerous other sources, (see Bio. Op. at 184-210).

The Biological Opinion indicates that the Project "includes dune and/or beach construction for 19 mi[les] of the entire 30 mi[les] or 63%, of Fire Island's coastline[,] * * * [which] would affect 100% of the overwash habitat created by Hurricane Sandy in the project area that is used by, or could be utilized by piping plover[,] * * * [but] also includes measures the [Army] Corps has proposed to avoid and minimize adverse effects to the piping plover * * *." (Bio. Op. at 12). The FWS determined that since twenty thousand eight hundred (20,800) feet of dune and beach construction is planned for undeveloped areas of the Park under the Project, the Project "would adversely affect breeding populations of plovers and their habitat." (Bio. Op. at 16).

9

a.       Piping Plovers

i.       Life and Habitat

Piping plovers that breed on the Atlantic Coast of the United States and Canada ("the Atlantic Coast piping plover"), such as those at issue here, are classified as threatened under the ESA and breed "on sandy, coastal beaches from Newfoundland to North Carolina." (Bio. Op. at 49, 53-54). "[W]ide, flat, sparsely-vegetated barrier beach habitats * * * [that] include abundant moist sediments associated with blowouts, washover areas, spits, unstabilized and recently closed inlets, ephemeral pools, and sparsely vegetated dunes" are important for the recovery of Atlantic Coast piping plovers. (Id. at 49, 54, 56). Although Atlantic Coast piping plovers "may also nest on areas where suitable dredge material has been deposited at a low slope and elevation, * * * many factors * * * affect their nesting density and success in th[o]se areas." (Id. at 54). The FWS determined that piping plover "[h]abitat became unsuitable when vegetative cover exceeded 33.5%, distance from the high tide line to toe of the dune was less than 9.5 meters, dune height exceeded 2.0 meters, and dune slope exceeded 20%[,]" (id. at 49), and that "piping plovers respond positively to the creation of high quality habitat * * *." (Id.)

ii.       Recovery Units

Four (4) recovery units have been established for the Atlantic Coast piping plover in an approved recovery plan, i.e., the 1996 revised Atlantic Coast Recovery Plan: (1) Atlantic (Eastern) Canada; (2) New England; (3) New York-New Jersey; and (4) Southern (Delaware,

Maryland, Virginia and North Carolina). (Bio. Op. at 59).[2] The FWS determined: (1) that "[t]he achievement and maintenance of the assigned population level and the associated habitat conditions necessary to support that population for each of the four recovery units are necessary for both the survival and recovery of the Atlantic Coast * * * piping plover[,]" (Bio. Op. at 50, 60, 61); (2) that "[t]he ability of both the Eastern Canada and New York-New Jersey recovery units to provide redundancy, resiliency, and representation that are essential to the survival and recovery of the Atlantic Coast population are particularly at risk[,]" (id. at 50, 74); (3) that "[t]he survival and recovery of Atlantic Coast piping plovers remain highly dependent on the conservation of remaining habitats and habitat-formation processes, as well as annual implementation of expensive labor-intensive management to minimize the effects of pervasive and persistent threats from predation and disturbance by humans and pets[,]" (id.); and (4) that "[r]eversals of major ongoing declines in the Eastern Canada and New York-New Jersey recovery units are urgent[,]" (id.).

### iii. Abundance

"The preliminary 2013 Atlantic Coast piping plover population estimate was 1,797 pairs, more than double the 1986 estimate of 790 pairs * * *[,]" (Bio. Op. 62), representing "a net 1989-2013 increase of 88%." (Id.) "Abundance in the New York-New Jersey recovery unit experienced a net increase of 24% between 1989 and 2013, but the population declined sharply from a peak of 586 pairs in 2007 to 397 pairs in 2013 (-32%) * * *." (Id. at 63). "During [that]

---

[2] Since recovery units were established in an approved recovery plan, the Biological Opinion "considers the effects of the [] [P]roject on piping plovers in the New York-New Jersey Recovery Unit, as well as the Atlantic Coast population as a whole." (Bio. Op. at 62).

period, several storms occurred as did beach stabilization and nourishment efforts, and human development increased * * *." (Id.) "Changes in the Long Island population account for most of the absolute growth in the recovery unit population through 2007 and most of the decrease that has occurred in the last six years." (Id.) "On Long Island, the south shore has been the greatest contributor to population changes (both positive and negative), supporting about 50% of the entire recovery unit population." (Id.) "Low abundance in New Jersey and recent steep decreases in abundance on Long Island (especially on the south shore) contribute to the recovery units [sic] demographic vulnerability." (Id.)

iv.    Vulnerability

"[L]oss and degradation of habitat remains a very prominent threat to piping plovers in the New York-New Jersey recovery unit."[3] (Bio. Op. at 52, 73, 84). "Within the New York Bight, which includes * * * the southern Long Island shoreline, more than half the beaches are classified as 'developed[]' * * * [and] many of [the remaining 'natural and undeveloped' beaches] are also subject to extensive stabilization activities that promote the formation of mature dunes, thus preventing overwash, inlet migration, and other natural coastal processes that create and maintain preferred plover habitats." (Id. at 52, 84). "Actions that further diminish the carrying capacity of habitat pose the greatest potential for additional reductions in the probability of persistence of the [New York-New Jersey] recovery unit population and will be the most difficult to reverse." (Id. at 73).

---

[3] Other threats to Atlantic Coast piping plovers include "disturbance by humans and pets, increased predation, [] oil spills * * * climate change and wind turbine generators * * *." (Bio. Op. at 83).

12

"A detailed review of threats to piping plovers and their habitat in their continental U.S. migration and wintering range * * * shows a continuing loss and degradation of habitat due to sand placement projects, inlet stabilization, sand mining, groins, seawalls and revetments, dredging of canal subdivisions, invasive vegetation, and wrack removal." (Bio. Op. at 51). "It is believed habitat loss and degradation via artificial coastal stabilization are limiting growth and expansion of the recovery unit population of Atlantic Coast piping plovers, especially in the New York-New Jersey and Southern recovery units[,] [as] [t]he rates of habitat loss are increasing coincident with more stabilization activities." (Bio. Op. at 52). "[C]ontinuing artificial shoreline stabilization perpetuates many low quality habitats * * * and [w]idespread artificial habitat stabilization also exacerbates conflicts with human beach recreation by constraining nests and chicks to narrow ocean-front habitats." (Id. at 51, 73). "This, in turn, increases the costs and effort required to manage threats to plovers from human and pet disturbance to the point where sustainability of th[o]se efforts may be compromised." (Id. at 73).

"Efforts to create and enhance piping plover nesting and foraging habitats * * * have been incorporated into a number of shoreline stabilization projects * * * and implemented by other recovery cooperators * * *[,] [but], with the exceptions of the Lower Cape May Meadows and Stone Harbor restoration projects in New Jersey * * *, most efforts to date have been small-scale * * * [and] monitoring and evaluation of restoration project effects on piping plovers and habitat indicators (e.g., habitat availability-use ratios, predator track indices) have been nonexistent or extremely limited * * *." (Bio. Op. at 53).

"While it is expected that carrying capacity will fluctuate locally, and perhaps even within a state over time, it is anticipated that long-term carrying capacity of the Atlantic Coast[] piping

13

plover habitat * * * will be maintained if natural coastal habitat formation processes are not interrupted." (Bio. Op. at 50-51, 71). "The 1996 revised [R]ecovery [P]lan states that discouraging new structures or other developments, discouraging interference with natural inlet processes, and discouraging beach stabilization projects are 'priority 1' actions (those that must be taken to prevent extinction or to prevent the species from declining irreversibly in the foreseeable future)." (Id. at 51, 83, 115-16). "Studies and reports completed since the recovery plan * * * reinforce the continued importance of protecting preferred piping plover breeding habitats and the natural coastal processes that form and maintain them." (Id.) "Scientific research conducted on Long Island explicitly recommended avoiding beach management practices (e.g., jetty construction, breach filling, dune building, beach nourishment) that typically inhibit natural renewal of ephemeral pools, bay tidal flats, and open vegetation * * * and allowing natural storm processes that create habitat to act unimpeded * * *." (Id.)

b.     Environmental Baseline

i.     Plover Population on Fire Island

"The piping plover population in the action area (Fire Island) has supported as many as 54 pairs of piping plovers (in 2008)." (Bio. Op. at 110). "The most consistent and major breeding sites over the last 15 years are Democrat Point, Fire Island Wilderness, and [the Park]." (Id. at 113). Prior to Hurricane Sandy, Democrat Point was the only site that provided the preferred "bay to ocean overwash" habitat for piping plovers. (Id.) Although bay to ocean overwash habitats were formed at the other two (2) sites by Hurricane Sandy, that habitat "was

14

only available to piping plovers at Democrat Point and Old Inlet due to partitioning of beach habitat undertaken by Suffolk County to delineate recreational ORV use areas and plover breeding habitats." (Id.) Prior to the formation of a partial overwash area at Lighthouse Beach, "all plover breeding habitat in [that] area[] was limited to the ocean beach south of an established dune line." (Id.)

Between 2009 and 2013, the total number of breeding pairs of piping plover declined by fifty percent (50%) and "productivity [chicks fledged per pair] for piping plovers on Fire Island and the surrounding Long Island area has been declining for the past 14 years * * *." (Bio. Op. at 113-14). "The 1996 Recovery Plan calls for a productivity level of 1.5 to create an increasing population and achieve recovery." (Id. at 114). "2013 productivity levels for Fire Island were close to 0.7, well below replacement." (Id.)

"Although the Fire Island piping plover population declined to 27 pairs in 2013, Hurricane Sandy created approximately 162 hectares of new overwash habitat on Fire Island including at least 84 hectares of new overwash habitat located within the [P]roject area with an estimated capacity of approximately 60 pairs of piping plovers * * * assum[ing] there is full bay to ocean connectivity of the newly created habitat across each of the three overwashes." (Id.) However, the FWS determined that that "assumption is uncertain given beach management activities in 2013." (Id.)

Furthermore, the FWS determined that "susceptibility of the [P]roject area to additional overwash during future storms * * * creates the likelihood of more habitat formation in the action area[,]" (id.); that "habitat availability will be the primary determinant of whether the breeding population is actually able to increase[,]" (id.); and that "[i]n light of the widespread

15

development and continuing stabilization elsewhere in the recovery unit, [Fire Island] plays a pivotal role via provision of existing habitat and the potential for future habitat formation that are key to survival and recovery of the piping plover in the New York-New Jersey recovery unit." (Id. at 110-11).

ii.    Factors Affecting Plovers on Fire Island

A.    Adverse Effects

The FWS determined that "[h]abitat limitation, loss, fragmentation, beach stabilization, avian and mammalian predators, recreation, and ORV use * * * are all factors negatively affecting the species [sic] environment, distribution, reproduction and abundance on Fire Island[,]" (Bio. Op. at 107-08, 115), and that "[t]he vast majority of the 30 miles of beaches on Fire Island have been heavily impacted by habitat loss due to development, as well as, beach stabilization and recreational activities for decades leading to the precarious conservation status of the species within the action area."[4] (Id. at 108-09). Specifically, there has been a "large degree of artificial stabilization that has occurred throughout the majority of piping plover habitat in the action area" since 1938, (Id. at 108, 116-17), "that has affected piping plover habitat" and "limited habitat area that is available for piping plovers on Fire Island, by inhibiting the

---

[4] "Action area" is defined in the Biological Opinion as "all areas to be affected, directly, or indirectly, by the federal action, and not merely the immediate areas involved in the action." (Bio. Op. at 109). "The 'action area' encompasses Fire Island, including ocean beaches, intertidal areas, interdunal areas, [] bay side habitats * * * dredged material placement sites and adjacent areas where dredged material deposition is not proposed * * * because of the potential for indirect effects (those effects that are caused by or will result from the proposed action and are later in time, but are still reasonably certain to occur) from littoral drift of sediments from the renourished reaches and thus, changes to the downdrift beaches in unnourished reaches." (Id.)

development of storm-created habitats that are important to the recovery of this species." (Id. at 116, 117-18). In addition, the FWS determined that "[v]egative reinforcement of dunes and their installation are common practices on Fire Island * * * [that] can prevent the formation of optimal nesting and foraging habitats for plovers * * *[,]" (id. at 108, 117); "beach scraping which involves the use of heavy machinery to remove approximately the top 6-inch layer of sand over a wide section of the dry beach * * * reduc[es] foraging habitat," (id. at 108, 117); and "[t]he use of sand fences and Christmas trees to capture drifting sand and/or to build dunes may produce steepened dune faces, or by themselves, create[] physical barriers to plover movement * * *[,]" (id. at 117), thereby "affect[ing] the abundance, distribution and reproduction of piping plovers on Fire Island." (Id. at 108, 118).

Moreover, the FWS determined that "[t]he stabilized beach system on Fire Island has limited piping plover to narrower beaches making them less likely to escape detection by red fox * * *[,]" (Bio. Op. at 118); that "[p]lovers that nest on human-made dunes may also be more susceptible to detection by red fox[,]" (id. at 108, 118); and that "the litter and food scraps left behind by recreational beach activities have the effect of attracting predators such as red fox and gull species to plover habitat." (Id. at 108, 118, 121).[5] The Biological Opinion indicates that the FWS "is not aware of any comprehensive predator control or trapping programs being implemented by the NYSOPRHP [New York State Office of Parks, Recreation and Historic Preservation], Suffolk County, or FIIS [Fire Island National Seashore]." (Id. at 118).

The FWS further determined that "[t]here are numerous potential sources of disturbance

---

[5] Other predators on Fire Island include black-backed gulls, herring gulls, American crow, dogs, feral cats, "other avian predators" and ghost crabs. (Bio. Op. at 108, 118).

to plovers that may utilize the FIIS including, but not limited to, ORVs [off-road vehicles], aircraft, recreational fishing, kite-flying, bird-watching, surfing, dog-walking, fireworks events, and vehicle patrols undertaken by law enforcement agencies that operate within the FIIS[,]" (Bio. Op. at 108, 118); that "breeding habitat on Democrat Point is limited due to establishment of recreational ORV areas[,]" (id. at 118); that "ORV tire tracks can cause deep ruts which are impassable to chicks * * *, causing them to become entrapped[,]" (id.); and that ORV "use can reduce the quality of available foraging habitat[,] * * * compact and reduce any existing foraging base * * * [and] * * * result in mortality of adults, nests, and chicks[,]" (id. at 119).

### B.    Beneficial Effects

The Biological Opinion indicates that the NPS's decision "to postpone moving forward with a consultation and proposal to fill in [the breach at Old Inlet] caused by Hurricane Sandy * * * [in order] to maintain newly created habitat as beneficial habitat for piping plovers for a period longer than if the breach were closed immediately through human action[] * * * is believed to provide a net benefit to the environmental baseline for piping plovers over the life of th[e] [P]roject." (Bio. Op. at 111). Other "[b]eneficial actions include monitoring and protection programs implemented by the NPS FIIS, NYSOPRHP, and [SCDPRC]," (Bio. Op. at 115), including the delineation and protection of "[s]uitable habitats * * * with symbolic fencing and monitor[ing] by staff[,]" (id.), and the implementation of "[v]ehicle closures * * * around breeding areas when flightless chicks are present[,]" (id.).

c.    Effects of the Project

The FWS determined that the Project "would perpetuate stabilization of beach habitats with likely negative consequences to the piping plover[,]" (Bio. Op. at 125), and "would affect all existing overwash areas and * * * impair the formation of new overwash habitats within the project area[,] * * * [which] are the preferred habitats of the piping plover * * *." (Id. at 12). "Consequently, the [] [P]roject would result in short- and long-term changes to plover nesting, foraging, and chick rearing habitats, ultimately affecting the species' numbers, distribution, and reproduction in the wild." (Id.) In addition, the FWS determined that the Project (1) "would directly and indirectly impact occupied piping plover breeding habitat across all of Fire Island[,]" (id. at 122); (2) "would indirectly affect habitats not within the project area, but adjacent to dune and beach construction activities due to longshore littoral drift," (id. at 12); and (3) "would result in both immediate and long term effects to habitat and the species [sic] distribution, numbers and reproduction in the wild, with ramifications to the Fire Island breeding unit, the south shore of Long Island, and the New York-New Jersey recovery unit as a whole[,]" (id. at 122). According to the FWS, the impacts of the Project may include "the loss and fragmentation of preferred bay to ocean overwash habitats, loss and degradation of partial overwash habitats, reduction in foraging habitats on bayside beaches, destruction of plover prey resources for at least one breeding season on oceanside beaches, increased predators, and increases in recreational disturbance (pedestrians and ORVS [sic])[,]" (id. at 125). The FWS further determined that:

> "[t]he destruction and modification of both foraging, nesting, and brood-rearing habitats resulting from the [Project] is likely to result in (1) reduction and eventual displacement of plovers from one or more existing Fire Island breeding sites; (2) higher mortality rates, delayed breeding, reduced nesting success and lower survivorship

of fledglings as a result of displacement; (3) the loss of potential
'source' breeding populations that may maintain, in part, through
emigration, other plover populations; (4) the fragmentation of, and
decline in, plover populations region-wide[;] and (5) increased
habitat loss, fragmentation, and functional homogenization on a
local and regional scale."

(Id. at 122-23, 125).

The FWS determined that other adverse effects of the Project "include interruption and

prevention of formation and maintenance of optimal habitats * * *, longer term reduction in prey

resources * * *, increased recreational activities, the creation of habitat conditions that may

facilitate increase [sic] mortality due to predators, and allowance for ORV access through

breeding areas * * *." (Id. at 123). In addition, the FWS found that proposed "[s]and fencing

can affect dune topography and promote the formation of steep, uniform dunes * * * [and] may

also affect the movement of mesopredators (such as raccoons, red fox and feral cats), provide

denning habitat for fox, and serve as perch sites for avian predators." (Id. at 123, 138-39).

Nonetheless, the FWS concluded that "[t]he degree to which increases in predator habitat result

in mortality or disturbances to plovers and their chicks depends on the degree to which the

protection measures are implemented." (Id. at 139).

The FWS further determined that "[r]ecreational activities that may potentially, adversely

affect piping plovers include unleashed pets, fireworks, kite-flying, and increase in garbage and

refuse * * *[,]" (id. at 123, 137), insofar as "[u]nleashed pets, such as dogs and cats, can prey on

piping plovers * * * [and] [k]ite-flying may disturb piping plovers as it is believed that the piping

plovers perceive kites as avian predators[,]" (id.); and that "[i]ndirect effects of disturbance to

piping plovers also occur by limiting breeding habitat to oceanside habitats that are

20

simultaneously made more attractive for recreational activities by beach stabilization projects."
(Id. at 138). Nonetheless, the FWS determined that "[o]verall, the degree to which increases in recreational activity result in mortality or disturbances to plovers and their chicks depends on the degree to which the protection measures are implemented." (Id.)

The FWS determined that "[a]ll current sub-populations of breeding plovers and occupied habitat on Fire Island, totaling about 26 pairs, would be impacted by the proposed [P]roject[,]" (Bio. Op. at 125), and indicated that "[b]ecause of the small number of breeding sites on Fire Island, the fragmented distribution, and vulnerability of small populations to stochastic processes (oil spills, storms, disease, etc.), [it] is concerned about the degradation or loss of any breeding site, as well as [the Project's] effect on the Long Island New York-New Jersey recovery unit." (Id.) According to the FWS, "[s]imulations of future plover populations on Fire Island and the south shore of Long Island * * * suggest a higher probability of decreasing populations and extinctions with the [] [P]roject than without it." (Id. at 124).

### i. Effects Due to Construction Activities

The FWS determined that although the Army Corps proposed that construction activities will not occur in the Park or at Lighthouse Beach during the piping plover season, i.e., from April 1st to September 1st, "[p]otential direct effects of [its] construction and dredging activities upon piping plovers during initial construction include * * *[:]

> 1) If construction starts prior to the arrival of piping plovers, dredging and construction operations adjacent to plover nesting habitat will prevent plovers from utilizing the habitat which is currently under construction upon their arrival, forcing them to seek appropriate habitat elsewhere.

21

2) Dredging and construction operations that encroach to within 1000 m of established plover courtship, nesting and brood rearing areas that were undisturbed during the beginning of the breeding season have the potential to disturb both adults and chicks that use this habitat. Impacts may include territory abandonment, disruption of pair bonds, nest abandonment, elevated predation of eggs and chicks due to adults being less attentive, and increased chick mortality due to reduced foraging opportunities. These effects will adversely affect piping plover productivity.

3) Dredging and construction operations, especially the movement of equipment and vehicles on the beach (e.g. dredge piping, beach grading), can greatly endanger nests and chicks. Nourishment activities occurring within 1000 m [of] chick rearing areas will result in a high probability that chicks and eggs in the vicinity of machinery will be accidentally crushed. * * * In addition, if dredge pipeline is placed in a manner that prevents plover chicks from gaining access to foraging habitats, * * * foraging opportunities during critical periods will be reduced and chick mortality may increase."

(Id. at 126). The FWS further determined that "[t]o the extent that the [Army] Corps adheres to the 1,000 m buffer in the FIIS Communities, [it] believes that the potential for impacts will be minimized, but will not be eliminated." (Id. at 127).

ii.     Fragmentation and Degradation of Preferred Habitats

The FWS determined that preferred plover habitats at the Park and Lighthouse Beach "would be degraded and fragmented by the [] [P]roject." (Bio. Op. at 127). Specifically, the FWS found that about one hundred twenty-one (121) acres at the Park "would be fragmented by the dune and vegetation, along with the re-establishment of Burma Road * * *[,]" and that more than sixty (60.3) acres of preferred habitat at Lighthouse Beach would be fragmented and impacted by "the artificially constructed berm." (Id.) In addition, "[t]he dune and beach fill

would raise both the berm and dune elevation of the barrier island further decreasing habitat heterogeneity." (Id.)

The FWS indicated its "concern[] that the [] [P]roject would disrupt complex natural processes that create bayside and bay to ocean intertidal foraging habitats, and that th[o]se changes would likely negatively affect chick survival and population growth." (Bio. Op. at 128-29). According to the FWS, although the Army Corps has proposed to "attempt to maintain nesting habitat on the bayside of Pattersquash and Narrow Bay areas through vegetation control north of Burma Road and the artificial dune[,]" (id. at 129), it has "no data that documents the use of isolated bay habitat by piping plovers, so [it] currently ha[s] no assurances that [that] area will support nesting pairs of piping plovers * * * [and] it is uncertain that [that] area[] would result in observed increases in plover abundance or productivity." (Id.) Accordingly, "[f]urther analysis or examples of bayside habitat are needed to determine the effectiveness of th[o]se habitats in supporting piping plovers." (Id.)

### iii.    Habitat Quantity

The FWS estimated that without the Project, the preferred habitats created by the storm "could support close to 60 nesting pairs of plovers if left in their post-storm condition[,]" (Bio. Op. at 129), "assum[ing] full connectivity of bay to ocean habitat," but indicated that that assumption "is uncertain given the existing Burma Road, which is currently degraded from pre-Hurricane Sandy conditions but in use." (Id. at 130). The FWS, thus, determined that the "'without project' estimate that 60 pairs worth of nesting habitat is available is not the best interpretation of reality given that ocean to bay habitat is already truncated in some fashion by

23

previous, recent anthropogenic habitat modification, e.g., sand fencing, vehicle use * * *[,]" (id. at 147), and that, "based upon the best available science and experience," (id. at 148), a more reasonable "without project' estimate [is] 51.25 for the entire project area[,]" (id. at 147).

The FWS estimated that the potential nest area "with Project" capacity would "support plover nesting ranges from 17 to nearly 40 pairs," (Bio. Op. at 130), and indicated that the reduction in the potential nest area capacity "would result mostly from the fragmentation and degradation of preferred habitats via construction of the artificial dune * * *[,]" (id. at 131). The FWS ultimately determinated that a reasonable estimate for potential nest area "with project" capacity "based on the best available science and experience" is 40.32 pairs. (Id. at 148).

The FWS determined that although "[b]each nourishment may provide nesting substrate for the species, * * * recent surveys undertaken at beach nourishment projects on Fire Island showed that th[o]se habitats supported low numbers of breeding pairs with limited to no reproductive output, and experienced high levels of recreational disturbance and degradation due to off-road vehicle use * * *." (Bio. Op. at 132). "Further, the density of piping plovers that are confined to ocean-side habitats is much lower, when preferred bayside foraging habitats are absent." (Id.) The FWS determined that "[c]onsequently, artificially created beaches without access to high quality bayside foraging areas, may lead to 'population sinks' by recruiting individuals to the area each season, only to yield reproduction levels less than one chick per pair which is below the level necessary to achieve a stationary population level." (Id.) The FWS further determined that "[i]n the event that plovers colonize these beaches they will experience loss of habitat area annually, as the beach erodes back to a stabilized dune[,]" (Bio. Op. at 132), and that "[b]ecause piping plovers demonstrate breeding site fidelity to their breeding sites, they

24

are likely to persist in attempting to breed in these areas, even if these habitats degrade and plover productivity declines in future years." (Id.) According to the FWS, "[i]n this way, the [] [P]roject may continue to expose piping plovers to indirect adverse effects even beyond the life of the [P]roject." (Id.) The FWS also determined that "[p]iping plovers, which may be attracted to the site, may also have reduced productivity due to low prey resources, increased disturbance, and predation." (Id.)

In addition, the FWS determined that "[h]abitat loss and adverse alterations can also result from physical changes to artificially constructed dunes and beaches." (Bio. Op. at 133). "Natural forces, which work to redistribute the sand that is placed on the beaches during nourishment projects, may create a sharp discontinuity of slopes between the upper beach and the intertidal zone, inhibiting the movement of piping plovers, especially chicks, into intertidal foraging areas." (Id.) In addition, beach scraping "may reduce the size of the intertidal foraging area, inhibit adult and chick movement into the intertidal zone, and possibly delay the formation of an upper beach wrack line, an important foraging habitat for piping plovers and their chicks." (Id.)

### iv. Impacts to Foraging Habitats and Prey Resources

The FWS determined that "[c]onstruction between mid-October and January * * * may result in reduced productivity, or possibly abandonment of piping plover nesting areas because of reduced prey resource availability * * *[,]" (Bio. Op. at 137), and that the Project "would be expected to impact prey resources for breeding adults and their chicks at least one breeding season." (Id.) Nonetheless, the FWS determined that "[e]xcept where curtailed by mechanical

beach raking or delayed by scarping [sic], partial to complete physical recovery of the organic material that comprises the wrack line can be expected within one year following sand nourishment, depending on the timing of the construction activity." (Id.)

###   d.   Cumulative Effects

The FWS determined that "[p]rivate projects to stabilize beaches, increase recreation, or build ORV roads are expected to degrade or destroy beach habitats such that plover population expansion is curtailed[,]" (Bio. Op. at 139); that "Suffolk County is planning to restore further Burma Road in [the Park] which would result in adverse effects * * * [and,] along with unregulated recreational activities such as boat landing and unrestricted pedestrian access[,] will disturb adults and prevent chick[s] from accessing bay side foraging habitats," (id. at 140); that "[l]arge scale habitat fragmentation is expected to occur at [the Park] as the [SCDPRC] further establish [sic] Burma Road as an ORV route within overwash habitat and piping plover breeding areas[,] [which] will destroy and degrade about 2.0 mi[les] of plover habitat," (id.); and that "[a]s part of [that] action [the SCDPRC] will install sand fences and plant beach grass, further stabilizing the beaches, and adversely affecting plovers and their habitats." (Id.)

The FWS further determined that although the "NYSDEC would be expected to continue to be able to issue tidal wetland permits for ocean and bay side stabilization activities, such as bulkhead construction, dune stabilization through sand bags and geotubes, and breach scraping[,] * * * it is uncertain the extent to which [that] action is expected to continue into the future * * *." (Bio. Op. at 140).

Additionally, the FWS determined that "[t]he NYSOPRHP will likely continue to

26

stabilize their beaches using material from dredging projects or upland sources[,]" (Bio. Op. at

140), and that those activities falling outside of the Army Corps's regulatory jurisdiction, e.g.,

breach scraping, dune construction, the installation of sand fences and the planting of beach

grass, would continue. (Id.) Furthermore, "[l]ocal entities would be expected to continue to

install sand fences and plant beach grass as part of their effort at beach stabilization," (id.);

"[SCDPRC] has installed miles of sand fences at [the Park], in the process degrading,

fragmenting, and ultimately destroying preferred piping plover habitat, * * * [and] negatively

affecting the species' distribution, abundance, and reproduction[,]" (id.); and "[b]oth

NYSOPRHP and [SCDPRC] [will] continue to issue thousands of ORV permits for use on their

beaches * * * [which] [will] continue to degrade and fragment plover habitat on large stretches of

beaches, and affect the species' distribution, abundance and reproduction[,]" (id.).

e.    Conservation Measures

The Biological Opinion indicates that "[f]or a period of ten years after project

completion, the [Army] Corps has proposed to implement a number of conservation measures to

avoid or minimize adverse effects of the dune and beach construction to the piping plover * * *."

(Bio. Op. at 16).

With respect to Lighthouse Beach, the proposed conservation measures include

modifying "the dune and beach design template" (a) to provide for "a 'straight' dune alignment,"

(id. at 17)[6]; (b) to reduce "[t]he tolerances for the proposed berm elevation * * * from ±1 ft to

_____

[6] This modification is subject to consultation under Section 106 of the National Historic

Preservation Act of 1966 ("NHPA").

27

±0.5 ft, meaning that minimum and maximum fill heights could not go below +9 ft or above +10 ft NGVD[,]" (id.); and (c) to build "dunes with slopes of 1V:5H with the seaward dune toe to match alignment," (id.).

With respect to the Park, the Army Corp "indicated that it is not feasible to eliminate the proposed dune and beach or vary their heights * * * without compromising coastal storm risk reduction or severely curtailing management activities, operations, and recreational use within th[e] [P]ark." (Bio. Op. at 18).

Additional conservation measures proposed by the Army Corps include: (a) modifying "the extent of length of each fill taper on federal lands on Fire Island to 300 ft.[,]" (Bio. Op. at 16-17); (b) removing vegetation in the area known as Great Gun Beach and managing the habitat "from an approximately 82 [acre] area to provide habitat for endangered species * * *[,]" (id. at 19), "as an experimental approach to mimic early successional habitat[,]" (id. at 20); (c) "monitor[ing] and adaptively manag[ing] vegetation at 30-40% cover on the bayside * * * via mechanical, manual, or chemical means dependent on conditions and regulations of [SCDPRC] and the NYSDEC," (id. at 19); (d) planting beach grass on the dunes at a density of eighteen (18) inches on center within the FIIS communities; (e) coordinating with the FWS "in the preparation of a predator plan (mammalian) for pre-season and in-season predator monitoring program for all project areas, * * * includ[ing] measures needed to protect piping plovers, nests, and chicks," (id. at 20), to be implemented for ten (10) years; (f) clearing vegetation and modifying topography of an additional 6 ha [hectares] (15.8 ac [acres]) of bay side habitat south of New Made Island, as an experimental approach to mimic nesting and foraging plover habitat[,]" (id.); (g) contacting the FWS "upon initiation and completion of construction activities[,] * * * conduct[ing] pre-

28

construction meetings with all project staff to provide all information on resource protection and terms of the [P]roject permit[,] * * *[and] [p]rovid[ing] all project personnel, construction staff, etc., with information regarding the conditions of the project (including all conservation measures)[,]" (id.); (h) refraining from all construction activities "during the piping plover breeding season April 1 to September 1, except [i] within the boundaries of the FIIS communities[,]" (ii) for "low impact construction activities, such as beach surveying, * * * utilizing a 300-ft protective buffer zone[,]" and (iii) that "[i]f piping plovers are not observed in a proposed project area, or are not within 1000 m of the project area by July 15, then [P]roject activities may commence, following consultation with the agencies[,]" (id. at 20-21); (j) "conduct[ing] surveys [by a qualified biologist required to attend a piping plover management course organized by the (FWS), NYSDEC, and The Nature Conservancy (TNC)] during the spring/summer, and prior to construction activities, to identify nesting plovers in the project area and to document all known locations of piping plover[,]" (id.); (k) protecting "breeding piping plovers on all suitable habitats in the action area from human disturbance * * * and predation * * * via symbolic fencing and warning signs" and the prohibition of "[a]ll pedestrian and off-road vehicle (ORV) access into, or through, the breeding * * * areas[,]" (id. at 21-22); and (l) conducting annual productivity and population surveys and daily monitoring, except during poor weather, (id. at 22-23).

The FWS determined that the Project "would, through each estimate, reduce the overall nesting area for future piping plovers[,] * * * [which they] need * * * to recover, * * * [but] that plover productivity on Fire Island, and the surrounding Long Island areas, is failing and is not on a path to recovering the species * * *, probably due to a mix of management-related elements,

29

such as predator and vegetation management." (Bio. Op. at 141). The FWS recognized the "many competing uses for Fire Island, e.g., recreation, storm protection, plover habitat" and the "need to operate in the current context of th[o]se competing uses." (Id.) Accordingly, the FWS determined that "[a]chieving recovery for the plover is dependent on cooperation from State, County and Federal partners, and other local landowners, and possibly on the creation of new habitat alternatives, such as engineered habitat," (Id.), since "[i]t may be as real and detrimental an outcome for the plover if the [FWS] were to not work cooperatively with State, County and Federal partners, and other local landowners, thereby not fully engaging their ability to promote recovery, than if significant plover habitat quantity and quality was degraded." (Id.)

The FWS further determined that "[r]estored and managed habitat for plovers may be essential for the long-term recovery of plovers in the NY and NJ recovery unit, and the[] engineered and created areas and subsequent monitoring [proposed as conservation measures in the Project] will provide essential information to help [it] learn how best to restore [plover] habitats." (Bio. Op. at 142). Accordingly, in order to "improve the quality and productivity of the available habitat," the various agencies, including the FWS and the Army Corps, agreed: (1) to implement (a) a coordinated inlet-to-inlet monitoring program, led by the NPS, "to add consistency to the monitoring and reporting of plover reproductive activities," (Bio. Op. at 142), (b) a coordinated ten (10)-year inlet-to-inlet mammalian predator management program, funded through the Army Corps, (id.), and (c) a coordinated stewardship/visitor management program to attempt "to eliminate or reduce human disturbance to plovers during all phases of breeding," (id. at 143); (2) to continue to follow federal ORV guidelines, (id.); (3) to manage the three (3) overwash areas, the Great Gun restoration site and the dredge restoration site "to inhibit

30

vegetation growth from impairing the quality of th[o]se available habitats[,]" (id. at 144), with the Army Corp building those areas to specifications to which the FWS agrees and Suffolk County maintaining the vegetation per the specifications, (id.); (4) to plant the dunes with non-invasive species, (id.); (5) to fence and vegetate Burma Road, and move it further south in certain areas "to allow for more foraging and nesting habitat on the bayside," (id.); and (6) to monitor and evaluate the effectiveness of the aforementioned measures throughout the Project and provide revised recommendations, if necessary, "relating to the restoration of breeding habitat and the optimization of reproductive success[,]" (id.).

### f. Jeopardy Analysis

The Biological Opinion indicates that "[t]he central question associated with [the FWS's] jeopardy analysis is whether the effects of the [Army] Corps [sic] [Project], together with cumulative effects, are likely to preclude or impair the capacity of the New York-New Jersey recovery unit from providing both the survival and recovery function assigned to it." (Bio. Op. at 145). "In other words, are the effects of the [Army] Corps [sic] [Project], together with cumulative effects, likely to preclude or impair the capability of th[e] [New York-New Jersey] recovery unit to support a minimum breeding population of 575 pairs of piping plovers that produce, on average, 1.5 fledged young per nesting pair?" (Id.) The FWS determined that the Project "will have an effect on the amount of nesting habitat available, even with the restoration acreage offered in the amended BA," (Id. at 148), but that its estimates regarding nesting density with and without the Project "do not quantitatively include the multiple expected benefits from the agreed to management actions[,]" (id.), which "will serve to improve the recovery outlook for

the plovers." (Id. at 149). Although set forth in the "Incidental Take Statement" section of the Biological Opinion, the FWS determined that the "level of anticipated take is not likely to result in jeopardy to the species or destruction or adverse modification of critical habitat." (Bio. Op. at 150).

g.    The Incidental Take Statement

The FWS determined that "the [P]roject as described in the BA (amended, May[] 21, 2014) will take up to 11 pairs of piping plover, through the modification of habitat[,] * * * equat[ing] to roughly 1 pair each year of the project[,]"[7] (Bio. Op. at 150), and that "[g]iven the extensive habitat management actions outlined [in the Biological Opinion] fewer pairs may be taken, yet it is difficult to quantify precisely the value of th[o]se measures." (Id.)

The FWS further determined that the following "reasonable and prudent measures are necessary and appropriate to minimize impacts of incidental take of piping plovers," (id.): (1) the development and implementation (a) "of a coordinated mammalian predator management strategy across all major landowners, inlet to inlet, on Fire Island to reduce the threat predators pose to piping plovers for the 10 year expected life of the project[,]" (id.), and (b) "of a coordinated piping plover monitoring program, inlet to inlet, on Fire Island, to assess the current and future status of plovers on Fire Island[,]" (id.); (2) the maintenance (a) "of buffers around construction sites (1000m) and breeding piping plovers (before July 15) and other human activities, including ORV use, (generally 200m) and breeding piping plovers[,]" (id.), and (b) "of

_____

[7] This estimate was derived by subtracting the FWS's "with project" estimate of plover nesting density from its "without project" estimate. (Bio. Op. at 150).

nesting and foraging habitat through vegetation management on the three overwash areas and the two restored areas in accordance with the guidelines detailed in the amended BA[,]" (id.); and (3) the creation (a) "of foraging habitat in the 33.7 [hectares] of Great Gunn [sic] through the design and implementation of ephemeral pools[,]" (id.), (b) "of plover foraging and nesting habitat on 6 [hectares] on the dredge disposal site south of New Made Island[,]" (id. at 151), and (c) "by the [Army] Corps of an interagency team (that includes the [FWS]) that will develop and implement a coordinated effectiveness monitoring program whose purpose is to document the performance of the restored and created plover areas[,]" (id.).

The Incidental Take Statement sets forth the "nondiscretionary" terms and conditions implementing the reasonable and prudent measures with which the Army Corps must comply "[i]n order to be exempt from the prohibitions of Section 9 of the [ESA][,]" (Bio. Op. at 151-52), and indicates that "[t]he reasonable and prudent measures, with their implementing terms and conditions, are designed to minimize the impact of incidental take that might otherwise result from the proposed action[,]" (id. at 152). The Incidental Take Statement further provides that "[i]f, during the course of the [Project], th[e] level of incidental take [of no more than 11 pair of piping plover] is exceeded, such incidental take represents new information requiring reinitiation of consultation and review of the reasonable and prudent measures provided[,] [and] [the Army Corps] must immediately provide an explanation of the causes of the taking and review with the [FWS] the need for possible modification of the reasonable and prudent measures." (Id. at 152-53). Moreover, "[i]n instances where the amount or extent of incidental take is exceeded, any operations causing such take must cease pending reinitiation." (Id. at 153).

33

3.     The Final EA

The EA indicates that the stated purpose of the Project is "to reinforce the existing dune and berm system along [Fire Island]," (EA at 10), because "[r]ecent storm events, most notably Hurricane Sandy in 2012, have reduced sand volumes of beaches and dunes in the project area, leaving communities on the coastal barrier and along the bay shores north of Fire Island vulnerable to potential future storm surges." (Id.)

a.     Alternatives Considered

The EA evaluates two (2) alternatives: (1) the "No Action Alternative" and (2) a "Beach Fill Alternative," i.e., the Project, (EA at 14), with the latter being "the recommended alternative and [] the environmentally preferred plan because it reduces storm damages in a manner that mimics the natural protective features of the barrier island * * *." (Id.)

i.     The "No Action Alternative"

The EA indicates that although the Army Corps and federal government would take no action to reduce storm damages in the study area under the "No Action Alternative," local governments and non-governmental groups, e.g., homeowner associations, "could take actions to protect themselves by undertaking their own construction projects to build up the beach and dune profiles." (EA at 14, 61). Some of the elements that the Army Corps found "likely to occur within the No Action Alternative" include, *inter alia*,"[p]eriodic beach fills and beach scraping * * * by local governments and home owner associations to maintain some threshold beach condition[,]" (id.), and closure of the breaches "either through natural closure or human

34

intervention, (id. at 15).

ii.     The Project

The Project is comprised of three (3) design templates: (1) the "berm only" template,

proposed for areas on Fire Island "where eroded berm conditions have been observed, but where

existing dune elevation and width are sufficient to reduce the risk of overwashing and

breaching," (EA at 15), i.e., Robert Moses State Park, western Smith Point County Park and the

TWA Memorial beach; (2) the "small" template, including berms and vegetated dunes at

specified elevations, widths and foreshore slopes, "intended to reduce the risk of breaching" and

"proposed for areas with limited oceanfront structures, including [the Park]," (id.)[8]; and (3) the

"medium" template, including a berm and vegetated dune with specified widths, elevations, dune

slope and foreshore slope, "proposed for areas that have the greatest potential for damages to

oceanfront structures [] includ[ing] the 17 communities on Fire Island[,]" (id. at 15-16).

The EA indicates:

> "Based upon consultation with the [FWS] * * *, project features
> have been incorporated as habitat offsets for Piping Plover. These
> features have been included as non-discretionary measures in the
> [P]roject as defined in the Reasonable and Prudent Measures of the
> Biological Opinion. These features * * * generally include: [1]
> [d]evegetation and topographical alteration and management in the
> Vicinity of Great Gunn [sic] Beach and extending eastward to
> Moriches Inlet, to provide approximately 33.7 hectares of piping
> plover nesting and foraging habitats including ephemeral pools[;]
> [2] [t]he creation of plover foraging and nesting habitat on six
> hectares of habitat in the vicinity of the dredge material

---

[8] The "small" design template also includes the "Fire Island Lighthouse Tract," or "modified 'small' design template," providing for an unvegetated dune at a specified length, elevation, side slope and crest width at Lighthouse Beach. (EA at 15).

management site located near New Made Island[;] [3] [t]he adaptive management of plover habitat through vegetation management to achieve sparsely vegetated overwash areas in [the Park] at the Pattersquash Island Overwash, Smith Point Breach Location, and New Made Island Overwash[;] [and] [4] [t]he development and implementation of a coordinated plover monitoring program, coordinated mammalian predator management plan, coordinated stewardship, and coordinated effectiveness monitoring to inform the adaptive management of these habitat offset areas."

(EA at 16). In addition, the EA identifies certain conservation measures and or project design adjustments undertaken by the Army Corps, including:

"In several areas, tapers have been adjusted per consultations with [the FWS] and [NPS] in order to address park objectives and minimize potential adverse impacts to threatened and endangered species.

The adjustments to the plan include 1) modification to the dune slope in areas to facilitate endangered species usage, 2) modification of the vegetation plan in these areas, 3) inclusion of a devegetation plan in these areas, 4) inclusion of a devegetation plan for an additional location to increase available shorebird habitat, and 5) modification to the dune alignment in another location to increase the amount of beach habitat.

There are three locations that have been identified for modification to the dune slope, modification of the vegetation plan and inclusion of a devegetation plan. The locations where these modifications have been included are in undeveloped locations that overwashed during Hurricane Sandy, where these plans could allow for shorebird access across the island. Three locations have been identified in [the Park] (Pattersquash overwash area, Smith Point breach area, and New Made Island overwash area). The [dune] slopes [in those areas] have been selected to allow for shorebirds to cross the dune structure. To ensure the continued access across the dune, no vegetation planting or snow fencing would be included as a component of the [P]roject in th[o]se locations. Further, in th[o]se three locations, the plan includes 10 years of monitoring and adaptive management to manage the density of vegetation, in a

36

condition optimal for endangered species usage. Within [Lighthouse Beach], a portion of the area will also include modification of the dune slope * * * and modification of the vegetation planting plan * * *. To be consistent with NPS management policies, this [Lighthouse Beach] area would not be subject to active management of the vegetation. In addition * * *, there is a recommendation to devegetate an area within [the Park], in the proximity of Great Gunn [sic], to improve the habitat for endangered species usage. This area has been selected as a wide, stable beach that presently has limited use by off road vehicles, and would have minimal management conflicts within the [P]ark. This area also includes 10 years of monitoring and adaptive management to manage the density of vegetation, and maintain a condition optimal for endangered species usage."

(EA at 21-22).

### b. Environmental Impacts

The Army Corps evaluated the environmental impacts, i.e., the effects upon the human environment; socioeconomics; transportation; recreation; cultural resources; physical environment, including water quality, geology/geomorphology and borrow areas; and natural resources, under both the No Action Alternative and the Project. (EA at 61-100).

### i. No Action Alternative

Generally, the Army Corps concluded:

"With the No Action Alternative, a large storm will likely result in major damage to structures and possibly human safety, since the entire [Project area] lies within the 100 year flood plain. Therefore, even no action has negative environmental consequences, since during low frequency storm events, no action will probably mean a loss of property and potentially even human life. Since the No Action alternative does not meet the needs of the communities, it is not the socially preferred alternative."

(EA at 61). The Army Corps also found that under the No Action Alternative "storms analogous to historic trends, consisting of frequent minor to moderate events, are likely to result in moderate adverse impacts to" land use and communities, social and economic interests, transportation, and recreation, and that those impacts "would be expected to be short to long term, depending on storm frequency and severity." (Id. at 61-63).

In addition, the Army Corps concluded, *inter alia*, that under the No Action Alternative "[a] single catastrophic storm event outside of the wilderness area, is likely to result in severe adverse impacts to transportation, including potential loss of roadways, travel routes, parking areas, and marinas, including ferry facilities[,] * * * [that] would be expected to be long term[,]" (EA at 62), and that a "[l]oss of essential transportation, including for emergency services, could have severe repercussions during an emergency situation and could severely hinder rebuilding efforts." (Id.)

With respect to the effects upon the physical environment, the Army Corps concluded, *inter alia*:

> "Under the No Action Alternative, continued erosion unchecked by sand bypassing or beach nourishment, could result in changes to the shoreline and geomorphologic characteristics of Fire Island. The shoreline would be expected to recede at its average pre-nourishment rate of 1.5 ft./yr. overall.[] This would lead to progressive dune and shoreline retreat or degradation, which could lead to increased risk of overwash and breach in one or more of the community areas. A breach or overwash would have moderate to major impacts on littoral processes and beach and dune sediments over a period of five to ten years. Impacts would be moderate if a breach were closed with emergency measures, or could be major if it were allowed to remain open. * * *"

(EA at 65-66).

With respect to the effects upon natural resources, and specifically, endangered or threatened species, the Army Corps concluded, *inter alia*, that the No Action Alternative "will continue the current level of protection that is afforded for rare and endangered species occupying the project area." (EA at 68, 73). With respect to migratory wildlife, the Army Corps concluded that the "No-Action Alternative is expected to have little beneficial to no impact on [the rare migratory bird species that may utilize the Project area referenced in another section of the EA, including the piping plover]." (Id. at 58, 68).[9]

In addition, the Army Corps concluded that "[u]nder the No-Action alternative, there would be continuing shoreline erosion and a strong possibility of a breach or overwash occurring during a tropical or extra-tropical storm." (EA at 68). According to the Army Corps:

> "Ebb and flood tidal deltas, overwash fans, and sand spits are commonly created by breach and overwash events. After breach inlet closure, the sediment that has accumulated in the ebb tidal delta is generally reworked by waves and re-introduced into the littoral drift, while the sediments deposited into the flood tidal deltas typically remain in place and serve as the substrate for future wetlands and eelgrass beds [citation omitted]. * * * [A] general increase in species diversity and numbers often follows such environmental perturbations. Many wildlife species are particularly attracted to these early successional habitats and physically dynamic areas. Such areas provide loafing, foraging, and nesting habitat for several species of shorebirds * * *. Additionally, the areas on the barrier where overwash/breaching events are most likely to occur are typically characterized by low elevation dunes and interior areas, and gently sloping beaches. These areas are favored by piping plovers and their broods in search of easy access to the bay-side mud flats to feed [citation omitted]. * * *

---

[9] Although the Army Corps specifically references the different tern species, as well as the common loon, black rail and cormorants, it does not expressly mention the piping plover, Cooper's hawk, osprey or peregrine falcon. (EA at 68).

39

The seasonality of breach or overwash occurrence may limit the extent of the impact to the local ecology. For instance, most overwash events occur during northeaster (fall and winter) storms when the piping plovers have migrated elsewhere. In addition, the loss of beachfront habitat * * * may negate the beneficial impacts of overwash habitat creation. Should the breach occur in the spring or summer due to a storm, the destruction of shorebird nests by wind and flooding would be a more negative impact than any presumed short-term overwash habitat gain. Similarly, low-lying degraded beaches are also at risk of experiencing overwash during much smaller storm events, and in turn threatening any shorebird nesting activities."

(EA at 68-69).

With respect to the specific effects of the No Action Alternative upon the piping plover, the Army Corps concluded:

"Elias-Gerken, (1994) studied piping plover use in the project area to identify any discernible trends in habitat suitability. She determined that certain habitat elements were lacking, particularly ephemeral pools for feeding. Coupled with the scarcity of open or sparsely vegetated sites, approximately 80 percent of the Fire Island National Seashore is not suitable for breeding habitat. The presence of open vegetation (median cover of 10 percent) was determined to be an important habitat element to support foraging piping plover chicks, in the absence of ephemeral pools and when easy access to bay mudflats is restricted. Thus, suitable habitat is limiting piping plover numbers on the Fire Island barrier. Elias-Gerken further suggested that storm-maintained, early successional stage habitats, such as created by overwash fans, provide optimal breeding conditions for piping plovers.

If a breach is closed or an overwash area is formed the winter prior to the shorebird breeding season (April 1-July 1), piping plovers * * * will immediately use the newly altered area for foraging. Gently sloping overwash fans that extend into the backbay marshes provide prime foraging habitat. Due to routine dynamic changes in washover or breach areas, the vegetation typically remains sparse. This provides optimal nesting habitat. The insects associated with the sparse vegetation * * * also provide a food source for the foraging shorebirds. However, shorebirds may be subject to nest

40

failure due to subsequent wash-overs at the same location.

In direct contrast to the benefits derived from overwash deposits, a barrier island breach and continued beach erosion could have negative impacts on piping plovers. A breach occurring during the nesting season could result in the direct loss of eggs, and mortality of chicks and/or adults. Flood tidal deltas resulting from a breach may provide additional foraging areas for piping plovers. However, this benefit must be weighed against the loss of beachfront nesting habitat. Continued erosion of the beach and fore-dune can create erosion scarps, thereby degrading existing or other potential plover habitat."

(EA at 73, 92).


ii.     The Project

The EA indicates, in relevant part, that with the Project:

"coastal storm risk on Fire Island would be offset in the areas proposed for beachfill. The placement of beach fill in the designated areas would manage risk to the residential, recreational, and commercial uses by increasing protective sand volumes. Effects on long-term barrir [sic] island geological processes are anticipated to be short-term and temporary. Implementation of the beach nourishment alternative wouldreduce [sic] the likelihood and magnitude of damages for residents and businesses in the coastal barriers during non-catastrophic events. The [Project] would also afford increased protection to the communities along the bayshore by reducing the likelihood of coastal barrier breaching. Due to the reduced likelihood of breach and inundation of the bayshore, residential, recreational and commercial structures are much less likely to be damaged or destroyed, access to homes businesses [sic] is less likely to be interrupted, and utility service is less likely to be disrupted. In the near term this additional protection will afford a window of opportunity for communities to undertake other adaptation to reduce the potential for flood and erosion damage. The coastal barrier will resume processes of natural transition over time as the beach fill erodes, and implementation of other measures to ensure community resilience will be necessary to address storm risk and sea level rise. The proposed actions do not address

41

flooding that may occur in bay shore communities due to water entering the existing inlets."

(EA at 75-76).

The Army Corps determined that with the Project, "storms analogous to historic trends, consisting of frequent minor to moderate events, are likely to result in minor adverse impacts to" land use and communities, social and economic interests, transportation, and recreation, and that those impacts "would be expected to be short term, depending on storm frequency and severity." (Id. at 76-77). In addition, the Army Corps determined that "[a] single catastrophic storm event is likely to result in minor to moderate adverse impacts to transportation. While some flooding and minor road damages could occur, there would be no loss of transportation systems. These impacts would be expected to be short term and there would be no loss of essential transportation, including for emergency services." (EA at 76).

With respect to impacts upon the physical environment, the Army Corps determined that the Project:

> "would alter the beach/dune profile substantially, reducing the potential for breaching and overwash during storm events and creating greater stability of the barrier island features. By changing the natural coastal barrier processes of shoreline retreat, inlet formation and shoal accumulation, the [P]roject could affect coastal processes, such as longshore sediment transport, cross island sediment transport, dune development and evolution, estuarine circulation, and bayside shoreline processes, that are vital to maintaining coastal features (i.e., beach, dunes and barrier island)."

(EA at 79). In addition, the Army Corps determined that "[i]mpacts to the physical characteristics of the borrow area would be expected to be adverse, minor to moderate and short

42

term." (Id. at 80).

With respect to the impacts of the Project upon natural resources, the Army Corps

concluded:

> "Perhaps the greatest disturbance associated with beach filling is
> destruction of nesting areas for shorebirds that may be onsite or on
> beaches adjacent to such an operation. Least terns and piping
> plovers commonly nest in the project area. * * *
>
> With [the Project], construction activity on the adjoining marine
> beach habitat may disrupt normal activity of faunal species;
> however this disturbance would be temporary. The long-term
> effect of active management of the coastal barrier by sand
> placement and dredging activities is uncertain. * * * The overall
> impact to the barrier island ecosystem that would result from the
> increased sand volumes under the [Project] would be temporary
> protection from storm damages with uncertain but temporary
> disruption of transitional barrier habitats.
>
> * * *
>
> Numerous species of shorebirds forage along the beaches, marshes,
> and intertidal flats of the project area from spring through fall. As
> the extent of available [backbay ecosystem] habitat is likely to
> remain relatively constant with the [Project], no impact to these
> species would be expected."

(EA at 84-91). Specifically with respect to the piping plover, the Army Corps concluded, in

relevant part:

> "Conducting the beach fill operation outside of the least tern and
> piping plover nesting season is the easiest way to avoid adverse
> impacts * * *.
>
> The period of concern for the piping plover and least tern in the
> proposed project area, extends from April 1 when the birds begin
> to arrive and establish territories, to August 31, when all of the
> young have fledged. Once the birds have arrived, construction
> activities should not be scheduled if such activities would disrupt
> their nesting rituals. When construction activities occur, shore

43

birds may avoid the active construction site temporarily. Given the miles of shoreline and tidal flats on Fire Island outside of the [P]roject work areas, the availability of habitat is not a limiting factor and this temporary effect would not be significant, outside of the nesting area.

Creating additional beach width and elevation would provide more habitat for the plovers and terns. However, this may have little positive impact on their long-term success because they currently do not lack appropriate shorefront nesting habitat. The nourished beach, however, may decrease flooding of the shorebird nests, due to the increased elevation, during the hurricane season, and may provide some real but immeasurable benefit. Beach slope is also a critical factor for piping plover habitat selection and use.

As the proposed [P]roject will be constructed outside of the piping plover breeding season (April 1 - August 31), no adverse impacts to the piping plover will occur from the proposed filling activities. [citation omitted].

* * * Potential indirect impacts are anticipated to piping plovers * * * and their habitat. Beach nourishment could have both beneficial and adverse effects on [this] beach-dependent species. If the result of the sand placement produces a higher, wider beach and more available, suitable habitat for * * * piping plovers, there can be potential positive habitat impacts. This could reduce flooding and potential loss of individuals and progeny * * * and provide additional habitat for more colonization.

On the other hand, creating additional habitat in heavily disturbed community areas could result in sub-optimal or nonfunctional habitat, which could also result in a population sink. Wider, higher beaches could attract and result in higher recreational use and an increase in predation with additional habitat available for predators. Numerous studies have documented the direct and indirect adverse effects of human disturbance on piping plovers * * *. Since the ocean beaches already receive high public use and have protected areas for rare flora and fauna, no shift or change in existing use is expected. This is also the case with human induced predator impacts, as both beach conditions and predator populations fluctuate and cycle.

Further, construction activities would temporarily impact beach

invertebrates and prey base of plovers * * *. Intertidal zone prey base would be affected, as project activities would place material below the high tide line. These impacts will be short term and minimal due to time of year placement and the amount of intertidal area along Long Island. * * *

The construction of the beach and dune building could preclude natural overwash processes and early successional habitat formation in the short term. Nourishment would also bury or remove established beach vegetation and temporarily retard vegetative growth. It would provide a gently sloping beach and wider intertidal areas for increased plover breeding and foraging * * *. The [P]roject could also bury or temporarily remove the wrack line, an important source of prey for plovers.

Nourishment of the beach towards more stabilized conditions can preclude natural habitat formation, including overwash and back-bay foraging sites. The habitat resulting from the activities will be temporarily changed, as well as available prey base (potential removal of wrack/beach invertebrates). These conditions may be positive or negative, as more beach will be available as breeding habitat, but natural habitat formation of overwash areas could be precluded. These manipulated conditions are expected to be temporary and localized and the affected area [to] quickly recover and recolonize with prey. Effects of this [P]roject are recognized to not last through dynamic winters the shoreline will returned [sic] to its natural configuration within five years. The [P]roject will allow for overwash in all the other areas outside the project area along Fire Island.

[The Army Corps] has identified the following potential indirect adverse effects to listed species resulting from implementation of the project: [1] [d]isturbance to prey base and temporarily reduced prey availability (destruction of beach invertebrates and wrack line); [2] [r]eduction of potential for formation and maintenance of overwash or bayside piping plover breeding and foraging habitat; [3] [d]isturbance to piping plovers through enhancing beaches to attract increased recreational activities on oceanside beaches; [4] [i]ncreased potential predator populations/activity that could utilize habitat created by the [P]roject; and [5] [c]hanges in existing plover * * * habitat[] on FIIS (could be positive or negative).

[The Army Corps] coordinated with the [DOI] (NPS and [FWS]),

45

NYSDEC and Suffolk County and developed modifications to the
proposed beach fill component of the [Project] that would provide
increased protection and improved productivity for listed species,
including the piping plover. In addition, [the Army Corps] conduct
[sic] pre-construction field surveys for active piping plover nesting
areas."

(EA at 92-94).

### c.    Cumulative Impacts

The Army Corps concluded that

"[t]he cumulative impact assessment of federal nourishment
projects on the south shore of Long Island indicate that federal
project actions would occur in dynamic environment whose
inhabitants have adapted to these conditions. Studies indicate that
borrow area and sand placement areas re-colonize shortly after
construction activities are completed."

(EA at 101, 108).

With respect to the No Action Alternative, the Army Corps determined that "[b]ecause of

the low percentage of disturbance and the recolonization potential, no cumulative impacts from

[ongoing Federal and State civil projects occurring within close proximity to the Project] is

expected" under the No Action Alternative. (EA at 101).

With respect to the cumulative impacts of the Project, the Army Corps concluded:

"[T]he cumulative impacts of the Federal projects in the Study Area are
uncertain. The coastal barriers were originaaly [sic] created by natural
processes without human intervention. These natural processes
redistribute sand in the nearshore environment in response to gradual
erosion and storm events. Once coastal barriers are manipulated by human
interventions, which Fire Island has undergone through maintenance of the
inlets at either end of the island, they are no longer able to maintain their
natural equilibrium. In combination with sea level rise, lower shoreface
erosion, bayshore inundation and continuing natural sediment transport

46

processes, the long-term effect of sand placement and prevention of breaches on the coastal barriers is uncertain. The impacts are also interactive in that the stabilization of barrier beaches and mainland shoreline may alter/prevent early successional communities such as maritime beach from evolving in overwash areas. The natural barrier beach environment exists in a continually changing state of 'dynamic equilibrium' that depends on the size of the waves, changes in sea level relative to the land, the shape of the beach, and the beach sand supply. When any one of these factors changes, the others adjust accordingly. Development patterns that have built up over the years took place prior to research on coastal barrier behavior and sea level rise. Under the cumulative effect of natural processes acting on an environment altered by human intervention the proposed [Project] mediates between managing risk and natural processes. The additive damages to homes, businesses, the area's recreational resources, and its economy would be reduced by the [Project]. The use of natural and nonrenewable resources in the salvage, repair, and reconstruction in the aftermath of storm damage would also be reduced. The [Project] maintains the opportunity for long-term management plans in the project area to incorporate natural processes and sea level rise adaptation within risk reduction and community resilience strategies.

* * * Measures proposed to minimize the cumulative effects of the federal nourishment projects are * * * long-term protection of potential habitat for the * * * Piping plover * * *[;] pre and post construction field surveys for plovers * * *[;] [and] [o]utside of the communities work will be done from September 1 through April 1 on any given year * * *."

(EA at 102). In addition, the Project was modified to include, *inter alia*, the following

conservation measures in order "[t]o minimize adverse impacts on the listed species," (EA at

102), by increasing protection and improving productivity:

       (1)     relocating dunes "more landward;"

       (2)     revising dune tapers;

       (3)     modifying the dune slope, subject to consultation under Section 106 of the NHPA, and reducing the tolerances for the berm height at Lighthouse Beach;

(4)     devegetating "the four primary overwash areas in the [P]ark
        * * * to more closely mimic conditions suitable to plovers *
        * *" and monitoring and adaptively managing the "habitats
        on the bay side of the three overwash areas and ocean side
        of Great Gunn [sic] should they begin to fill in with
        vegetation, or otherwise undergo succession to a habitat
        unsuitable to plovers[;]" and

(5)     restoring "up to approximately 84 acres {34 hectares} of a
        now heavily vegetated area at Great Gunn [sic] Beach to
        early successional habitat" and creating "up to 6 hectare of
        bayside habitat" in the area of New Made Island.

(EA at 102-03). In the EA, the Army Corps indicated its belief that "the aforementioned

modifications to the [P]roject will protect the available bayside, maintain habitats that might

otherwise deteriorate over time, * * * create new habitat from areas currently unsuitable[,] * * *

provide for more suitable habitat over time and potentially increase overall plover productivity of

the area and advance the recovery of the species." (EA at 103).

    In addition to the aforementioned Project modifications, the Army Corps agreed, *inter*

*alia*, to the following conservation measures: to conduct surveys during the spring and summer,

and prior to construction activities, to identify nesting plover in the Project area and document all

known locations of piping plover for ten (10) years; to plant dunes at low densities; to contact the

FWS upon initiation and completion of construction activities and to hold pre-construction

meetings with all project staff to provide all information on resource protection and terms of the

Project; to provide all Project personnel and construction staff with information regarding the

conditions, including all conservation measures, of the Project; to refrain from all construction

activities between April 1 and September 1, unless breeding piping plovers are not observed in

an area, or are not within one thousand (1000) meters of an area by July 15; and to undertake

only low impact construction activities, such as beach surveying, during the piping plover breeding season, utilizing a three hundred (300)-feet buffer zone. (EA at 104). In addition, the Army Corps agreed: (1) to implement, in coordination with the FIIS, Suffolk County and the FWS, a monitoring program for ten (10) years to be undertaken by a designated biologist who will be educated about the species and required to attend a piping plover management course organized by the FWS, the NYSDEC and The Nature Conservancy and who will "recommend and implement changes in the location and configuration of symbolic fencing and warning signs and gauge the effectiveness of management actions[,]" (EA at 104); (2) to place symbolic fencing and warning signs around suitable habitat within the Project area prior to piping plover breeding season and in coordination with the land manager(s) and the FWS's biologists; (3) to prohibit all pedestrian and ORV access into, or through, the breeding areas; (4) to conduct productivity and population surveys and record such information each year; and (5) to coordinate with the FWS in the preparation of (a) a de-vegetation plan within the three (3) primary overwash areas in the Park for ten (10) years and (b) "a predator plan (mammalian) for pre-season and in-season predator monitoring program for all project areas * * * for ten years of activity[,]" (EA at 104-07).

The Army Corps determined that since "the mitigative measures * * * will lessen temporary impacts," (EA at 108) and the Project "is designed to minimize adverse environmental impacts, the cumulative impacts to occur on the south shore of Long Island are not significant to the human environment/communities present within this region." (Id.) In addition, the Army Corps concluded, *inter alia*, that

> "given the conservation measures and adaptive management plans

* * *, and the local implementation of existing [FWS] protection measures, impacts to [] piping plovers * * * associated with the proposed projects will be minimized. The precautions taken will allow dredging or upland source placement of fill and continuous operation, thereby providing the most cost-effective and expeditious operation, while minimizing long-term plover * * * impacts. These conditions are consistent with the findings during previous beach nourishment and breach filling activities."

(EA at 108).

5. The FONSI

On July 3, 2014, the Army Corps issued a FONSI determining, *inter alia*, that the Project "does not constitute a major Federal action significantly affecting the quality of the human environment" and, therefore, does not require the preparation of a detailed EIS. (FONSI, ¶ 4). That determination was based upon, *inter alia*, the following factors:

"a. [The Project] has been designed to minimize impacts and avoid adverse impacts to threatened or endangered species potentially occurring in the project area. Specifically, no work will be performed between 1 April and 1 September in order to avoid impacts to nesting piping plovers.

b. Due to the short project life of the [Project], no unacceptable adverse cumulative or secondary impacts would result from [its] implementation.

c. No additional long term adverse impacts to the environment would be associated with the proposed [P]roject."

(FONSI, ¶ 4). The Army Corps found that the Project "would result in no significant adverse environmental impacts and is the alternative that represents sound engineering practices and meets environmental standards." (Id., ¶ 5).

B.     Procedural Background

On September 12, 2014, plaintiff filed: (1) a complaint pursuant to the APA against

defendants challenging (a) the Biological Opinion issued by the FWS under Section 7(a)(2) of

the ESA and (b) the EA and FONSI issued by the Army Corps under NEPA; and (2) an

application pursuant to Rule 65 of the Federal Rules of Civil Procedure seeking a TRO and

preliminary injunction enjoining defendants "from undertaking, either directly or indirectly, or

causing or allowing [their] contractors * * * to undertake, the destruction or modification of

upland areas, beaches, intertidal areas, tidal flats, ephemeral pools, and shorelines at [the Park]

and [the Beach] * * *, including the construction of dunes, berms or roads, the operation of

motorized equipment, and any other activity that alters or may have the effect of altering, either

temporarily or permanently, the physical condition of the aforementioned areas [pending a ruling

on the motion for a preliminary injunction and during the pendency of this action, respectively]."

(OTSC at 2-3).  The complaint seeks declaratory and injunctive relief and asserts the following

eight (8) causes of action: (1) that the FWS's Biological Opinion is arbitrary and capricious, an

abuse of discretion and not in accordance with law because (a) it "contains no explicit

determination setting forth the Secretary's opinion whether the [] Project is likely to jeopardize

the Atlantic Coast piping plover," (Compl., ¶ 93), in violation of 16 U.S.C. § 1536(b)(3)(A) and

50 C.F.R. § 402.14(h) (first cause of action), (b) any "no jeopardy" determination that may

inferred from the Biological Opinion "is contradicted by the numerous significant adverse

impacts of the [] Project identified in the Biological Opinion[] * * * [and] therefore has no

factual or analytical basis * * * and is not rationally connected to the facts found in the Biological

Opinion[,]" (Compl., ¶ 96), (second cause of action), (c) it "improperly relies on conservation

51

measures that are lacking in detail, unenforceable, not certain to occur, and not related to any clearly articulated goal or benefit to the species[,]'" (Compl., ¶ 102), (fourth cause of action), and (d) the Incidental Take Statement "did not offer a rational explanation for its calculation of the [] Project's incidental take that is supported by facts in the record and based on 'the best scientific and commercial data available[,]'" (Compl., ¶ 99 (quoting 16 U.S.C. § 1536(a)(2))) (third cause of action); (2) that the Army Corps's "analysis of impacts to piping plovers," (Compl., ¶ 106), in its EA is arbitrary, capricious, an abuse of discretion, and not in accordance with law because "[w]ithout any scientific basis or support in the record, [it] ignores key findings in the Biological Opinion concerning the significant adverse impacts of the [] Project on piping plovers * * * [and] is not rationally connected to the facts," (Compl., ¶¶ 105-06) (fifth cause of action); (3) that the Army Corps's "failure to consider any reasonable alternatives to the proposed [] Project and to rigorously and objectively assess the No Action Alternative and the [] Project [in its EA] is arbitrary and capricious, an abuse of discretion and not in accordance with law[,]" (Compl., ¶ 109), in violation of 40 C.F.R. §§ 1502.14(a) and 1508.9(b) (sixth cause of action); (4) that the Army Corps's "failure to consider cumulative impacts [in its EA] as required by [40 C.F.R. § 1508.7] is arbitrary and capricious, an abuse of discretion and not in accordance with law[,]" (Compl., ¶ 112), (seventh cause of action); and (5) that the Army Corps's "issuance of a FONSI and failure to prepare an EIS is arbitrary, capricious, an abuse of discretion, and not in accordance with law[,]" (Compl., ¶ 115), because the FONSI "is unsupported by the record, which documents the integral ecological importance of First Island to the recovery of the piping plover, the precedent-setting nature of the [] Project, the significant cumulative impacts of the Project, the level of uncertainty associated with the Project's conservation measures, and the

52

degree to which the Project will adversely affect the survival and recovery of the threatened piping plover[,]" (Compl., ¶ 114), (eighth cause of action).

By Order dated September 12, 2014, *inter alia*: (1) defendants were ordered to show cause, by filing a memorandum in response to the plaintiff's application and any supporting evidence on or before September 18, 2014, why a preliminary injunction should not be issued; and (2) plaintiff's application for a TRO was granted upon its posting of an undertaking in the amount of ten thousand dollars ($10,000.00) pursuant to Rule 65(c) of the Federal Rules of Civil Procedure. Plaintiff posted the requisite undertaking on September 15, 2014.

On September 16, 2014, defendants filed a motion seeking, *inter alia*: (1) to dissolve the TRO pursuant to Rule 65(d)(4) of the Federal Rules of Civil Procedure; and (2) to extend their time to oppose the motion for a preliminary injunction for two (2) weeks, i.e., until Thursday, October 2, 2014, and plaintiff's time to reply thereto until Monday, October 6, 2014. By order dated September 17, 2014, *inter alia*, the branch of defendants' motion seeking extensions of time to oppose the motion for a preliminary injunction and to file a reply thereto was granted.

On September 18, 2014, plaintiff filed a cross motion seeking to strike certain paragraphs and exhibits of the Amanat declaration pursuant to Rule 408 of the Federal Rules of Evidence.

At 6:53 p.m. on October 1, 2014, defendants filed a motion ("defendants' October motion") seeking, *inter alia*: (1) to have this Court deem the TRO expired on September 26, 2014 by operation of law pursuant to Rule 65(b)(2) of the Federal Rules of Civil Procedure, or, in the alternative, to dissolve the TRO pursuant to Rule 65(b)(4) of the Federal Rules of Civil Procedure; and (2) an additional three (3)-week extension of time, i.e., until Friday, October 24, 2014, to oppose plaintiff's motion for a preliminary injunction. By order dated October 6, 2014,

*inter alia*, defendants' October motion was denied in its entirety.[10]

Also pending before the Court is FILPS's motion for leave to file a brief amicus curiae in opposition to plaintiff's motion for a preliminary injunction.[11]

III.    Discussion

A.      Standard for Injunctive Relief

"In general, district courts may grant a preliminary injunction where a plaintiff demonstrates 'irreparable harm' and meets one of two related standards: either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in [its] favor * * *." Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs., — F.3d —, 2014 WL 4900363 (2d Cir. Oct. 1, 2014) (quotations and citation omitted); see also Central Rabbinical Congress of United States & Canada v. New York City Dep't of Health & Mental Hygiene, 763 F.3d 183, 192 (2d Cir. 2014) (accord). However, "[a] plaintiff cannot rely on the 'fair-ground-for litigation' alternative to challenge governmental action taken in the public

_____

[10] Defendants' contention that the TRO expired by operation of law on September 26, 2014 ignores that fact that it was their request for a two (2)-week extension of time to oppose the motion for a preliminary injunction that resulted in the TRO extending beyond the fourteen (14)-day period prescribed by Rule 65(b)(2) of the Federal Rules of Civil Procedure. Had defendants not requested an extension, the motion for a preliminary injunction would have been fully briefed, and ready for determination, by September 22, 2014. Since it was defendants' own conduct that prolonged the TRO, there was good cause for extending the TRO until determination of plaintiff's motion for a preliminary injunction.

[11] In addition, on September 30 and October 1, 2014, the Incorporated Village of Mastic Beach and County of Suffolk, respectively, moved by way of order to show cause for leave to intervene in this action pursuant to Rule 24 of the Federal Rules of Civil Procedure. Those motions are presently returnable on October 29, 2014.

interest pursuant to a statutory or regulatory scheme[] * * * [because] governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." Otoe-Missouria Tribe, — F.3d —, 2014 WL 4900363 (quotations and citation omitted); see also Central Rabbinical, 763 F.3d at 192. That exception to the "two-track rule" for granting a preliminary injunction applies even if the party "seeking to enjoin governmental action taken in the public interest pursuant to a statutory or regulatory scheme * * * [also] seeks to vindicate a * * * public interest." Otoe-Missouria Tribe, — F.3d —, 2014 WL 4900363 (quotations and citation omitted). Accordingly, in order to grant plaintiff a preliminary injunction in this case, the Court must be sure that, in all likelihood, defendants have acted unlawfully before substituting its judgment for that of the political branches. See Otoe-Missouria Tribe, — F.3d —, 2014 WL 4900363. In other words, plaintiff must meet "the higher standard" of demonstrating a likelihood of success on the merits in order to obtain a preliminary injunction. See id.; Pres. Coal. of Erie Cnty. v. Fed. Transit Admin., 129 F. Supp. 2d 551, 564 (W.D.N.Y. 2000) (holding that a plaintiff must show irreparable injury and a likelihood of success on the merits in a NEPA case).

"The party seeking a preliminary injunction must also demonstrate that the public's interest weighs in favor of granting an injunction." Central Rabbinical, 763 F.3d at 192; see also Winter v. Natural Res. Def. Council, 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction. (quotations and citation omitted)). Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear

showing that the plaintiff is entitled to such relief[,]" <u>Winter</u>, 555 U.S. at 22, 129 S. Ct. 365, and is "never awarded as of right." <u>Id.</u> at 24, 129 S. Ct. 365.

B.     Likelihood of Success on the Merits

1.     The APA

The APA provides, in relevant part, that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.

"Pursuant to the APA, courts review contested agency action to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" <u>Brodsky v. U.S. Nuclear Regulatory Comm'n</u>, 704 F.3d 113, 119 (2d Cir. 2013) (quoting 5 U.S.C. § 706(2)(A)); <u>see</u> <u>also</u> <u>Karpova v. Snow</u>, 497 F.3d 262, 267 (2d Cir. 2007). "Under this deferential standard of review, [courts] cannot substitute [their] judgment for that of the agency." <u>Natural Res. Def. Council v. Fed. Aviation Admin.</u>, 564 F.3d 549, 555 (2d Cir. 2009); <u>see</u> <u>also</u> <u>Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.</u>, 556 U.S. 502, 513, 129 S. Ct. 1800, 173 L. Ed. 2d 738 (2009) (holding that under the "narrow" arbitrary and capricious standard of review, "a court is not to substitute its judgment for that of the agency * * *." (quotations and citation omitted).

Nonetheless, "[a]lthough highly deferential, this standard does not equate to no review." <u>Brodsky</u>, 704 F.3d at 119. "Notably, the APA contemplates that, in deciding a challenge to

56

agency action, a court will review the administrative record to ensure that the agency examined the relevant data and articulated a satisfactory explanation for its action." Brodsky, 704 F.3d at 119 (quotations and citation omitted); see also Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378, 109 S. Ct. 1851, 104 L. Ed. 2d 377 (1989) (holding that courts must "ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." (quotations omitted)); Karpova, 497 F.3d at 268 ("[S]o long as the agency examines the relevant data and has set out a satisfactory explanation[,] including a rational connection between the facts found and the choice made, a reviewing court will uphold the agency action * * *.") "[T]he agency's decision must reveal a rational connection between the facts found and the choice made." Brodsky, 704 F.3d at 119 (quoting Natural Res. Def. Council, Inc. v. U.S. EPA, 658 F.3d 200, 215 (2d Cir. 2011)); see also Fed. Aviation Admin., 564 F.3d at 555 (accord). "[A]n agency determination will only be overturned when the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Karpova, 497 F.3d at 267-68 (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)). However, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." Marsh, 490 U.S. at 378, 109 S. Ct. 1851.

"[W]hile a court can uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned, it may not itself supply a reasoned basis for the agency's action than the

agency itself has not given." Brodsky, 704 F.3d at 119 (quotations and citation omitted). "An agency's decision is accorded a presumption of regularity," Coal. on W. Valley Nuclear Wastes v. Bodman, 625 F. Supp. 2d 109, 116 (W.D.N.Y. 2007), aff'd sub nom Coal. on W. Valley Nuclear Wastes v. Chu, 592 F.3d 306 (2d Cir. 2009) (quotations and citation omitted), "and the party challenging the decision has the burden of proof." Id.; see also Natural Res. Def. Council, Inc. v. U.S. Army Corps of Eng'rs, 457 F. Supp. 2d 198, 220 (S.D.N.Y. 2006) (accord); Boatmen v. Gutierrez, 429 F. Supp. 2d 543, 548 (E.D.N.Y. 2006) ("Plaintiffs bear the burden of showing, by citation to evidence in the administrative record, that an agency's actions are arbitrary and capricious.")

The only issues presented in this case are whether the findings and conclusions of (1) the FWS in its Biological Opinion and (2) the Army Corps in its EA and FONSI are arbitrary and capricious under the APA. Since resolution of plaintiff's claims involves primarily issues of fact, and "analysis of the relevant documents requires a high level of technical expertise," Marsh, 490 U.S. at 377, 109 S. Ct. 1851 (quotations and citations omitted), "defer[ence] to the informed discretion of the responsible federal agencies" is required. Id.

2.      The ESA

Section 7(a) of the ESA provides, in relevant part:

> "Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency * * * is not likely to jeopardize the continued existence of any endangered species * * * or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical,

> unless such agency has been granted an exemption from such
> action by the Committee pursuant to subsection (h) of this section.
> In fulfilling the requirements of this paragraph each agency shall
> use the best scientific and commercial data available."

16 U.S.C. § 1536(a)(2).[12] Regulations promulgated under the ESA provide, in relevant part, that, with exceptions not relevant here, formal consultation is required whenever a federal agency determines that an "action may affect listed species or critical habitat."[13] 50 C.F.R. § 402.14(a).

The FWS is responsible for administering the ESA with respect to all endangered and threatened wildlife and plant species designated in 50 C.F.R. § 17.11 and 17.12, respectively, see 50 C.F.R. § 402.01, including the piping plover. See 50 C.F.R. § 17.11(h). During formal consultation, the FWS must:

---

[12] "Jeopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. "Recovery means improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the [ESA]." Id.

"Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical." Id.

[13] "Formal consultation" is defined as "a process between the [FWS] and the Federal agency that commences with the Federal agency's written request for consultation under section 7(a)(2) of the [ESA] and concludes with the [FWS's] issuance of the biological opinion under section 7(b)(3) of the [ESA]." 50 C.F.R. § 402.02.

"Listed species means any species of fish, wildlife, or plant which has been determined to be endangered or threatened under section 4 of the [ESA] * * * [and] are found in 50 CFR 17.11-17.12." Id.

"Critical habitat refers to an area designated as critical habitat listed in 50 CFR parts 17 or 226." Id. No critical habitat has been designated in the Project area.

"(1) Review all relevant information provided by the Federal agency or otherwise available. * * *

(2) Evaluate the current status of the listed species or critical habitat.

(3) Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.

(4) Formulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

(5) Discuss with the Federal agency and any applicant [its] review and evaluation * * *, the basis for any finding in the biological opinion, and the availability of reasonable and prudent alternatives (if a jeopardy opinion is to be issued) that the agency and the applicant can take to avoid violation of section 7(a)(2) [of the ESA]. The [FWS] will utilize the expertise of the Federal agency and any applicant in identifying these alternatives. If requested, the [FWS] shall make available to the Federal agency the draft biological opinion for the purpose of analyzing the reasonable and prudent alternatives. * * *[14]

(6) Formulate discretionary conservation recommendations, if any, which will assist the Federal agency in reducing or eliminating the impacts that its proposed action may have on listed species or critical habitat.

(7) Formulate a statement concerning incidental take, if such take may occur.

(8) * * * [U]se the best scientific and commercial data available and * * * give appropriate consideration to any beneficial actions

---

[14] "Reasonable and prudent alternatives refer to alternative actions identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, that is [sic] economically and technologically feasible, and that the [FWS regional director, or his authorized representative] believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.02.

taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation[] [in formulating its biological opinion and any reasonable and prudent alternatives or measures]."

50 C.F.R. § 402.14(g).

a.    The Biological Opinion

Section 7(b) of the ESA provides, in relevant part:

"Promptly after conclusion of consultation under paragraph (2) * * * of subsection (a) of this section, the Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat. If jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) of this section and can be taken by the Federal agency or applicant in implementing the agency action."

16 U.S.C. § 1536(b)(3)(A).[15] Pursuant to the ESA's promulgating regulations,

"The biological opinion shall include: (1) [a] summary of the information on which the opinion is based; (2) [a] detailed discussion of the effects of the action on listed species or critical habitat; and (3) [t]he [FWS's] opinion on whether the action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a 'jeopardy biological opinion'); or, the action is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a 'no jeopardy' biological opinion). A 'jeopardy' biological opinion shall include reasonable and prudent alternatives, if any. If the [FWS] is unable to develop such alternatives, it will indicate that to

---

[15] "[T]he document that states the opinion of the [FWS] as to whether or not the Federal action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat" is known as a "[b]iological opinion." 50 C.F.R. § 402.02.

the best of its knowledge there are no reasonable and prudent alternatives."

50 C.F.R. § 402.14(h).

Plaintiff contends that the FWS's Biological Opinion is arbitrary and capricious because: (1) it failed to determine whether the Project will jeopardize the continued existence of the piping plover and any "no jeopardy" conclusion that can be inferred from the Biological Opinion "is not rationally related to the biological facts cited [therein][,]" (Plf. Mem. at 32); (2) "it relied on vague and uncertain conservation measures to justify its purported no-jeopardy determination[,]" (id. at 36); and (3) the Incidental Take Statement failed to "use the best scientific and commercial data available," (Plf. Mem. at 40 (quoting 16 U.S.C. § 1536(a)(2))), and to consider that the Army Corps's "planned habitat restoration measures have no proven success and indeed have been found unlikely to succeed[,]" (id.).

i.      Jeopardy Determination

The two hundred seventeen (217)-page Biological Opinion thoroughly considered the current status of the piping plover; the environmental baseline; the effects, both adverse and beneficial, of the proposed action; and the cumulative effects of the proposed action in addressing whether the Project is likely to jeopardize the continued existence of the piping plover or result in the destruction or adverse modification of critical habitat. Contrary to plaintiff's contention, the Biological Opinion contains an express "no jeopardy" determination, insofar as it sets forth the FWS's opinion that the "level of anticipated take" resulting from the Project "is not likely to result in jeopardy to the [piping plover] species or [in the] destruction or adverse

modification of critical habitat." (Bio. Op. at 150). A review of the record establishes that the FWS thoroughly examined all relevant data and articulated a satisfactory explanation for its determination that the level of anticipated take of up to eleven (11) pairs of piping plovers during the life of the Project, or roughly one (1) pair per year, is not likely to result in jeopardy to the species, i.e., to appreciably reduce the likelihood of both the survival and recovery of the species in the wild.

Moreover, the fact that the final Biological Opinion differs from the FWS's draft opinion, which concluded "that the effects of the proposed action, taken together with the status of the species, the environmental baseline, cumulative effects, are likely to appreciably reduce the likelihood of both the survival and recovery of piping plover in the wild by reducing its reproduction, abundance, and distribution[,]" (Draft Bio. Op. at 142), does not warrant a finding that the final Biological Opinion is arbitrary and capricious. "[T]he FWS was entitled to, and did, in fact, change its mind," Southwest Ctr. For Biological Diversity v. U.S. Bureau of Reclamation, 143 F.3d 515, 523 (9th Cir. 1998), following discussions with the Army Corps, and state and local agencies regarding "ways to increase the quantity and productivity of the available habitat." (Bio. Op. at 141). The FWS considered all relevant factors and reasonably found, *inter alia*, that there is a "need to operate in the current context of [all] competing uses," (id.), and that the "nondiscretionary" conservation measures set forth in its final Biological Opinion, which were absent and/or different from the draft Biological Opinion, were sufficient to avoid jeopardy to the piping plover.

Since, *inter alia*, there is a rational connection between the facts found and the "no jeopardy" determination made by the FWS in the Biological Opinion, and plaintiff has not

63

demonstrated that the FWS relied upon any improper factor, failed to consider an important aspect of the problem, or offered an explanation contrary to the evidence before it, or that the "no jeopardy" determination is so implausible that it cannot be ascribed to a difference in opinion, it has not demonstrated a likelihood of success on the merits of its APA claim alleging that the FWS's jeopardy analysis in its Biological Opinion was arbitrary and capricious.

ii.     Conservation Measures

The FWS properly relied upon mitigation or conservation measures in issuing its no jeopardy determination in the Biological Opinion. See, e.g. Native Fish Soc'y v. Nat'l Marine Fisheries Servs., 992 F. Supp. 2d 1095, 1113 (D. Or. 2014). Such "[m]itigation measures must be reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards." Natural Res. Def. Council v. Rodgers, 381 F. Supp. 2d 1212, 1241 (E.D. Calif. 2005); see also Native Fish Soc'y, 992 F. Supp. 2d at 1113 (accord); Ctr. for Biological Diversity v. Salazar, 804 F. Supp. 2d 987, 1001 (D. Ariz. 2011) ("[M]itigation measures may be included as part of a proposed action and replied upon where they involve specific and binding plans and a clear, definite commitment of resources for future improvements to implement those measures." (quotations and citation omitted)). Nonetheless, '[w]hile the proposed mitigation measures must insure against jeopardy to the protected species if they work as intended, while there must be a rational reason to expect them to work as intended, and while they must in fact be possible to implement, there is no requirement for the FWS to ensure the overall success of the plan." In re

Operation of Missouri River Sys. Litig., 421 F.3d 618, 635 (8th Cir. 2005). In other words, it is the implementation of the proposed conservation or mitigation measures themselves, and not the anticipated results of such measures, that must be certain to occur.

Contrary to plaintiff's contention, the conservation measures set forth in the Biological Opinion are sufficiently specific and certain, particularly when considered together with the nondiscretionary terms and conditions set forth in the Incidental Take Statement, (Bio. Op. at 151-52), insofar as, *inter alia*, they are identifiable, capable of implementation, subject to deadlines and other enforceable obligations, and address the threats to the piping plovers resulting from the modification of their preferred habitat by ensuring the creation of suitable replacement habitat. That some of the proposed measures may be experimental does not warrant a finding that the FWS's reliance upon them is arbitrary and capricious since, *inter alia*, there is at least a rational reason to expect them to work as intended; "there is no requirement for the FWS to ensure the overall success of the plan[,]" In re Operation of Missouri River Sys. Litig., 421 F.3d at 635; and the Army Corps is required to closely monitor the performance of the measures and the effects of the Project upon the piping plovers and, if the level of incidental take is exceeded, to "immediately provide an explanation of the causes of the taking and review with the [FWS] the need for possible modification of the reasonable and prudent measures," (Bio. Op. at 152-53), and to cease "any operations causing such take," (id. at 53), pending reinitiation of consultation. See, e.g. In re Operation of Missouri River Sys. Litig., 421 F.3d at 635.

Moreover, the fact that some of the measures may require interagency cooperation does not render them uncertain, particularly since, *inter alia*, all of the agencies were represented at the meetings wherein those measures were proposed and agreed upon; the Army Corps is

65

required to fund the measures and to ensure that the three (3) overwash areas and the restored

area are managed in accordance with the measures; the interagency team must be formed prior to

the initiation of any construction; and the monitoring and predator management plans must be

drafted before the completion of the first phase of construction. (Bio. Op. at 151-52). And

again, if the level of incidental take is exceeded during the course of the Project due to the failure

of a third party to cooperate or otherwise, the Army Corps must "immediately provide an

explanation of the causes of the taking and review with the [FWS] the need for possible

modification of the reasonable and prudent measures," (Bio. Op. at 152-53), and cease "any

operations causing such take," (id. at 53), pending reinitiation of consultation.

Accordingly, plaintiff has not satisfied its burden of demonstrating a likelihood of success

on the merits of its APA claim alleging that the FWS's reliance upon the conservation measures

in issuing its no jeopardy determination in its Biological Opinion is arbitrary and capricious.

### iii. Incidental Take Statement

The ESA provides, in relevant part:

> "If after consultation under subsection (a)(2) of this section, the
> Secretary concludes that– (A) the agency action will not violate
> such subsection, or offers reasonable and prudent alternatives
> which the Secretary believes would not violate such subsection;
> [and] (B) the taking of an endangered species * * * incidental to
> the agency action will not violate such subsection[] * * *[,] the
> Secretary shall provide the Federal agency and the applicant
> concerned, if any, with a written statement that– (i) specifies the
> impact of such incidental taking on the species, (ii) specifies those
> reasonable and prudent measures that the Secretary considers
> necessary or appropriate to minimize such impact, * * * and (iv)
> sets forth the terms and conditions * * * that must be complied
> with by the Federal agency or applicant (if any), or both, to

implement the measures specified under clause[] (ii) * * *."

16 U.S.C. §1536(b)(4)[16]; see also 50 C.F.R. § 402.14(i)(1).  "Reasonable and prudent measures,

along with the terms and conditions that implement them, cannot alter the basic design, location,

scope, duration, or timing of the action and may involve only minor changes."[17]  50 C.F.R. §

402.14(i)(2).

Plaintiff contends that the FWS's Incidental Take Statement is arbitrary and capricious

because it failed to "use the best scientific and commercial data available," (Plf. Mem. at 40

(quoting 16 U.S.C. § 1536(a)(2))), and to consider that the Army Corps's "planned habitat

restoration measures have no proven success and indeed have been found unlikely to succeed[,]"

(id.).  However, plaintiff has not proffered any scientific or commercial data presented to or

before the FWS that contradicts the data upon which the FWS relied and was ignored by the

FWS in its Biological Opinion.  Moreover, a review of the administrative record reveals that

there is ample data supporting the proposed conservation measures and, as noted above, that

those measures are reasonably specific, certain to occur, and capable of implementation; are

subject to deadlines or otherwise enforceable obligations; and sufficiently address the threats to

the species in a way that satisfies the jeopardy and adverse modification standards, particularly in

light of the extensive monitoring programs to which the Project will be subject and the provision

---

[16] The written statement required by Section 1536(b)(4) is referred to as an "incidental take statement."

[17] "Reasonable and prudent measures refer to those actions the [FWS's regional director] believes necessary or appropriate to minimize the impacts, i.e., amount or extent, of incidental take." 50 C.F.R. § 402.02. "Incidental take refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." Id.

for reinitiation of consultation and cessation of operations in the event the level of incidental take is exceeded. Accordingly, plaintiff has not satisfied its burden of demonstrating a likelihood of success on the merits of its APA claim alleging that the FWS's Incidental Take Statement is arbitrary and capricious.

### 3. NEPA

"NEPA directs agencies contemplating 'major [f]ederal actions significantly affecting the quality of the human environment' to prepare an Environmental Impact Statement ('EIS') demonstrating agency consideration of the reasonably foreseeable environmental effects." Brodsky, 704 F.3d at 119 (quoting 42 U.S.C. § 4332(2)(C))[18]; see also Stewart Park and Reserve

---

[18] 42 U.S.C. § 4332 provides, in relevant part:

> "The Congress authorizes and directs that, to the fullest extent possible: * * * (2) all agencies of the Federal Government shall– * * * (C) include in * * * major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on– (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

> Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and

Coal. Inc. (SPARC) v. Slater, 352 F.3d 545, 557 (2d Cir. 2003) ("NEPA requires a federal agency to prepare an EIS before taking any major action 'significantly affecting the quality of the human environment.'") "The purpose of an EIS is to 'provide full and fair discussion of significant environmental impacts and [to] inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize [the] adverse impacts or enhance the quality of the human environment.'" SPARC, 352 F.3d at 557 (quoting 40 C.F.R. § 1502.1); see also Baltimore Gas and Elec. Co. v. Natural Res. Def. Council Inc., 462 U.S. 87, 97, 103 S. Ct. 2246, 76 L. Ed. 2d 437 (1983) ("NEPA has twin aims. First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. * * * Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." (quotations and citation omitted)); 40 C.F.R. § 1500.1 ("The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment.")

"[N]o EIS is required where the major federal action is not 'significant' within the meaning of NEPA." Town of Orangetown v. Gorsuch, 718 F.2d 29, 34 (2d Cir. 1983); see also 40 C.F.R. § 1501.4(b) ("In determining whether to prepare an [EIS] the Federal agency shall * * * prepare an [EA] * * *."); City of New York v. Slater, 145 F.3d 568, 571 (2d Cir. 1998) ("Before deciding to prepare a full-blown EIS * * * an agency may conduct an [EA] * * * in

---

enforce environmental standards, shall be made available * * * to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes[.]"

order to determine whether an EIS is necessary. Where the action in question is not 'significant,' no EIS is required."); Friends of Ompompanoosuc v. Fed. Energy Regulatory Comm'n, 968 F.2d 1549, 1556 (2d Cir. 1992) ("If an agency prepares an EA and determines that a project will have no significant impact on the human environment, a costly and time consuming EIS need not be prepared.") An EA is defined in the regulations promulgated under NEPA as:

> "a concise public document for which a Federal agency is
> responsible that serves to: (1) [b]riefly provide sufficient evidence
> and analysis for determining whether to prepare an [EIS] or a
> [FONSI][;] (2) [a]id an agency's compliance with [NEPA] when
> no [EIS] is necessary[;] [and] (3) [f]acilitate preparation of a
> statement when one is necessary."

40 C.F.R. § 1508.9(a); see also Nat'l Audubon Soc'y v. Hoffman, 132 F.3d 7, 12 (2d Cir. 1997) ("An EA is a concise document that briefly discusses the relevant issues and either reaches a conclusion that preparation of an EIS is necessary or concludes with a finding of no significant impact, in which case preparation of an EIS is unnecessary." (quotations, brackets and citation omitted)); Coal. for Responsible Growth and Res. Conservation v. U.S. Fed. Energy Regulatory Comm'n, 485 F. App'x 472, 474 (2d Cir. June 12, 2012) (summary order) ("If an agency is uncertain as to whether the action requires an EIS, it must prepare an [EA] that briefly provides sufficient evidence and analysis for determining whether to prepare an EIS." (quotations, alterations and citations omitted)). The regulations further provide that an EA "[s]hall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E) [of NEPA], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b).

"NEPA imposes only procedural requirements to ensure that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts[,]" Winter, 555 U.S. at 23, 129 S. Ct. 365 (quotations, brackets and citation omitted), and "does not mandate particular results." Id.; see also Marsh, 490 U.S. at 371, 109 S. Ct. 1851 ("NEPA does not work by mandating that agencies achieve particular substantive environmental results. Rather, NEPA promotes its sweeping commitment to 'prevent or eliminate damage to the environment and biosphere' by focusing Government and public attention on the environmental effects of proposed agency action." (quoting 42 U.S.C. § 4321)); SPARC, 352 F.3d at 557 ("NEPA is a procedural statute that mandates a process rather than a particular result.") "In other words, NEPA does not command an agency to favor any particular course of action but rather requires the agency to withhold its decision to proceed with an action until it has taken a 'hard look' at the environmental consequences." SPARC, 352 F.3d at 557 (quoting Sierra Club v. U.S. Army Corps of Eng'rs, 701 F.2d 1011, 1029 (2d Cir. 1983)). "Significantly, '[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.'" Fed. Aviation Admin., 564 F.3d at 556 (brackets in original) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350, 109 S. Ct. 1835, 104 L. Ed. 2d 351 (1989)); see also Baltimore Gas, 462 U.S. at 97, 103 S. Ct. 2246 ("Congress in enacting NEPA * * * did not require agencies to elevate environmental concerns over other appropriate considerations. * * * Rather, it requires only that the agency take a 'hard look' at the environmental consequences before taking a major action." (citation omitted)). "The only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences; it

cannot interject itself within the area of discretion of the executive as to the choice of the action to be taken." SPARC, 352 F.3d at 557 (quotations and citations omitted); see also Baltimore Gas, 462 U.S. at 97-98, 103 S. Ct. 2246 ("The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious.") "Thus, judicial review of administrative choices under NEPA focuses primarily on the procedural regularity of the decision, rather than on its substance." Brodsky, 704 F.3d at 118-19 (quotations, alterations and citation omitted); see also Friends of Ompompanoosuc, 968 F.2d at 1556 ("Judicial review of agency decisions regarding whether an EIS is needed is essentially procedural." (quotations and citation omitted)).

Plaintiff contends that the Army Corps's EA violates NEPA because it failed: (1) to consider relevant factors in its analysis of the Project's potential impacts on piping plovers; (2) to adequately evaluate all reasonable alternatives and to explain why it rejected alternatives proposed by other federal agencies; and (3) to adequately evaluate cumulative impacts. (Plf. Mem. at 43).


a.      Effects of the Project

Plaintiff challenges, *inter alia*, the Army Corps's determination that the Project's impacts are "insignificant" on the basis that the EA "contains numerous unsupported and inaccurate assertions about the Project's impacts on the piping plover that are inconsistent with the findings in the Biological Opinion and the scientific evidence and comments provided to the [Army] Corps by FWS." (Plf. Mem. at 44).

Plaintiff has not satisfied its burden of showing a likelihood of success on the merits on

its APA claim that the Army Corps's EA is arbitrary and capricious. The one hundred twenty-three (123)-page EA thoroughly identifies and evaluates all relevant factors including, *inter alia*, the environmental impacts, both adverse and beneficial, of the Project upon the piping plover species and habitat, and cites to numerous authorities in support of its findings. (See EA at 114-23). Since the Army Corps considered all environmental consequences of the Project and convincingly documented its determination that the Project would have "no significant adverse environmental impacts * * *," (FONSI, ¶ 5), plaintiff has not established a likelihood of success on the merits of its APA claim against the Army Corps alleging that its EA failed to adequately consider all relevant factors.

### b. Consideration of Reasonable Alternatives

Under NEPA, "an agency must '[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.'" Fed. Aviation Admin., 564 F.3d at 556 (brackets in original) (quoting 40 C.F.R. § 1502.14(a)); see also Natural Res. Def. Council v. U.S. Dep't of Agric., 613 F.3d 76, 85 (2d Cir. 2010). "[U]nder NEPA the range of alternatives that must be discussed is a matter within an agency's discretion," Friends of Ompompanoosuc, 968 F.2d at 1558, and "the range of alternatives an agency must consider is narrower when * * * the agency has found that a project will not have a significant environmental impact." Id.; see also Brodsky v. U.S. Nuclear Regulatory Comm'n, 507 F. App'x 48, 53 (2d Cir. Jan. 7, 2013) (summary opinion).

Plaintiff contends that the Army Corps "failed to consider reasonable alternatives and to

identify reasons for dismissing th[o]se alternatives," (Plf. Mem. at 46), and "also failed to rigorously and objectively evaluate * * * the No Action Alternative and the [] Project Alternative * * *." (Id.) Specifically, plaintiff identified several alternatives proposed by the FWS in its January 9, 2014 letter that were not included in the EA, (id. at 47-48), i.e., "construct[ing] an enhanced berm" instead of a "solid dune," constructing a "'staggered dune' approach," having "breaks in the dunes" at the Park, or not having a dune constructed through "at least one of the three overwash lobes," (Chang Decl., Ex. 6), as well as shifting the dune alignment at Lighthouse Beach "north to lie adjacent to the [FIIS's] western access road," (Chang Decl., Ex. 5).

Contrary to plaintiff's contention, the Army Corps clearly considered the proposed alternatives modifying the dune designs and "briefly discussed" its reasons for rejecting those alternatives in the EA by finding, *inter alia*, that within the Park, "it is not feasible to eliminate the proposed dune system or vary its height without compromising coastal storm risk management or severely curtailing county park management, operations and use." (EA at 103).[19] In addition, the Biological Opinion indicates that in response that the FWS's proposed alternatives, the Army Corps: (1) indicated at the December 18, 2013 meeting, *inter alia*, that it "slightly modifie[d] the dune alignment at [Lighthouse Beach] * * * to address the [FWS's] December 13, 2013[] comments," (Bio. Op. at 6); and (2) provided the FWS with "updated project plans for a portion of the [P]roject at [the Park] * * * advis[ing] that the constructed dunes must be straight lines, with as shall transitions as possible, but they can be modified during

---

[19] Moreover, the FWS even indicated that one of its proposed alternatives, i.e., the "staggered dune" approach, was only "experimental[,]" (Chang Decl., Ex. 6), and "there is no need to consider alternatives of speculative feasibility * * *." Natural Resources Defense Council, Inc. v. Callaway, 524 F.2d 79, 93 (2d Cir. 1975).

the Plans & Specification period of project planning[] * * * [and] that the back slope of the dune design can be modified slightly * * * for a 'smaller' overall foot print." (Bio. Op. at 6). Thus, it is clear that the Army Corp rigorously explored and objectively evaluated the alternatives proposed to it by the FWS and provided rational reasons for its elimination of those alternatives.

Moreover, the EA adequately explores and objectively evaluates the two (2) reasonable alternatives, i.e., the No Action Alternative and the Project, in terms of, *inter alia*, their environmental risks and benefits and "was not required to say more." Brodsky, 507 F. App'x at 53. Accordingly, plaintiff has not established a likelihood of success on the merits of its APA claim against the Army Corps alleging that its consideration of alternatives in the EA is arbitrary and capricious.

c.     Evaluation of Cumulative Impacts

Under NEPA, "the agency 'shall consider . . . 3 types of impacts': direct, indirect, and cumulative." Fed. Aviation Admin., 564 F.3d at 558 (ellipsis in original) (quoting 40 C.F.R. § 1508.25(c)). The regulations define "cumulative impact" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.

Plaintiff contends that the EA "fails to take a 'hard look' at cumulative impacts because it (1) fails to identify and analyze the impacts of several past, present, and reasonably foreseeable future actions in the proximity of the [] [P]roject and (2) fails to adequately consider the cumulative impacts of the seven projects it does identify." (Plf. Mem. at 50).

Review of the administrative record reveals that the Army Corps adequately analyzed the cumulative impacts of all past, present and reasonably foreseeable future actions on existing conditions in the vicinity of the Project in full compliance with NEPA. NEPA does not require a federal agency to consider the cumulative impacts of an incomplete, contingent or speculative project or action, see Village of Grand View v. Skinner, 947 F.2d 651, 659 (2d Cir. 1991); Callaway, 524 F.2d at 90 (holding that a federal agency need not "consider other projects so far removed in time or distance from its own that the interrelationship, if any, between them is unknown or speculative."); Pogliani v. U.S. Army Corps of Engr's, No. 1:01-cv-0951, 2007 WL 983549, at * 21, 22 (N.D.N.Y. Mar. 28, 2007), and plaintiffs have not demonstrated that any of the purportedly omitted projects or actions were sufficiently imminent or inevitable, or even "extremely likely," Callaway, 524 F.2d at 88, as to be considered "reasonably foreseeable." See, e.g. Airport Impact Relief, Inc. v. Wyckle, 192 F.3d 197, 206-07 (1st Cir. 1999) (holding that speculative and contingent actions are not "reasonably foreseeable" within the meaning of NEPA). Specifically, the Fire Island Inlet to Montauk Point, NY project (FIMP) was originally authorized in the River and Harbor Act of 1960, (EA at 10), and has been undergoing a "Reformulation Study" since 1994. (Id. at 10, 12). While the Reformulation Study proceeds, three (3) Interim Plans have been developed, (id. at 12), and the Army Corps sufficiently considered the cumulative effects of those Interim Plans in the EA. (Id. at 101-02). There is no indication in the administrative record that the Reformulation Study is near completion or that implementation of the FIMP is imminent or extremely likely. Similarly, there is no indication that any beach stabilization activity "currently [being] evaluat[ed] at Robert Moses State Park on Fire Island" by "other agencies such as the department of Housing and Urban Development,"

(Chang Decl., Ex. 8), are sufficiently imminent or inevitable as to be considered "reasonably foreseeable."

Moreover, contrary to plaintiff's contention, the EA considers, *inter alia*, the cumulative effects of local "[p]eriodic beach fills," (Plf. Mem. at 51) (brackets in original). (See EA at 101 ("Suffolk County periodically dredges local channels for maintenance purposes. * * * The dredging takes place mostly in the bays and not on the open Atlantic Ocean coast. The dredged materials are used as beach fill whenever the materials are suitable, and the placement is cost effective.")

In addition, plaintiff has not demonstrated that the Army Corps's cumulative effects analysis is inadequate. To the contrary, the Army Corps furnished sufficient information on, and analysis of, the cumulative effects of the past, present and reasonably foreseeable future actions within the vicinity of the Project by, *inter alia*, disclosing other sufficiently imminent or inevitable planned or proposed beach stabilization actions in proximity to the Project area and discussing and analyzing their combined environmental impacts with the Project.

Since plaintiff has not demonstrated that the Army Corps failed to consider the cumulative effects of any past, present of "reasonably foreseeable," i.e., imminent or inevitable, future actions occurring in the vicinity of the Project, or that the Army Corps' consideration of the cumulative effects of the actions identified in the EA is inadequate, it has not established a likelihood of success on the merits of its APA claim against the Army Corps alleging that the EA's cumulative impact analysis was arbitrary and capricious.

4.    The FONSI

"If, pursuant to the EA, the agency concludes that no EIS is required, it must provide its reasons in a FONSI." Brodsky, 704 F.3d at 120; see also 40 C.F.R. § 1501.4(e) ("In determining whether to prepare an [EIS] the Federal agency shall * * * [p]repare a [FONSI] * * *, if the agency determines on the basis of the [EA] not to prepare a statement."); Coal. for Responsible Growth, 485 F. App'x at 474 ("if the agency finds that an EIS is not necessary, the agency will issue a [FONSI].") A FONSI is defined in the regulations as:

> "A document by a Federal agency briefly presenting the reasons why an action * * * will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared. It shall include the [EA] or a summary of it and shall note any other environmental documents related to it (§ 1501.7(a)(5)). If the [EA] is included, the [FONSI] need not repeat any of the discussion in the [EA] but may incorporate it by reference."

40 C.F.R. § 1508.13. "The agency shall make the [FONSI] available to the affected public as specified in § 1506.6." 40 C.F.R. § 1501.4(e)(1). "The decision not to prepare an EIS is left to the informed discretion of the agency proposing the action or project." Slater, 135 F.3d at 571 (quotations and citation omitted); see also Hoffman, 132 F.3d at 14 ("[W]hether a particular agency action will have a 'significant' effect on the environment is a substantive question left to the informed discretion of the agency proposing the action."); Gorsuch, 718 F.2d at 34 ("The issue of whether a particular agency's action will have a 'significant' effect on the environment is a substantive issue which has traditionally been left to the informed discretion of the agency proposing the action or project.")

In Hoffman, the Second Circuit held that:

> "in reviewing an administrative decision not to issue an EIS, a

78

> federal court must undertake a two-step analysis. First, [the court]
> must consider whether the agency took a 'hard look' at the possible
> effects of the proposed action. * * * Second, if the agency has
> taken a 'hard look,' [the court] must ask whether the agency's
> decision was arbitrary and capricious."

132 F.3d at 14; see also Friends of Ompompanoosuc, 968 F.2d at 1556 ("Once an agency has

made a decision subject to NEPA's procedural requirements, the only role for a court is to ensure

that the agency has considered the environmental consequences. * * * Accordingly, a reviewing

court must ensure that [the federal agency] has taken a 'hard look' at the environmental

consequences and assess whether the agency has convincingly documented its determination of

no significant impact." (quotations, alterations and citations omitted)). "The court's "inquiry

must be 'searching and careful,' although the ultimate scope of judicial review is narrow."

Hoffman, 132 F.3d at 14 (quoting Marsh, 490 U.S. at 378, 109 S. Ct. 1851). "The judiciary must

not inject itself into an area where the choice of action to be taken is one confided by Congress to

the executive branch." Id. Plaintiff bears the burden of showing that the Project will

significantly affect the physical environment and, thus, that the Army Corps's decision to issue

an EA and FONSI was arbitrary and capricious. See County of Seneca v. Cheney, 12 F.3d 8, 12

(2d Cir. 1993).

"Significantly as used in NEPA requires considerations of both context and intensity[.]"

40 C.F.R. § 1508.27; see also County of Seneca, 12 F.3d at 12 ("Under NEPA, an EIS or EA is

not required unless the contemplated action will affect the environment 'in a significant manner

or to a significant extent,' with significance defined in terms of both context and intensity.")

"[T]he significance of an action must be analyzed in several contexts such as society as a whole

(human, national), the affected region, the affected interests, and the locality[,] * * * [and] varies

with the setting of the proposed action." 40 C.F.R. § 1508.27(a). "Both short- and long-term effects are relevant." Id.

Intensity "refers to the severity of impact." 40 C.F.R. § 1508.27(b). NEPA regulations provide that the following ten (10) factors "should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. * * *[;]

(2) The degree to which the proposed action affects public health or safety[;]

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas[;]

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial[;]

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks[;]

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration[;]

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts[] * * * [;]

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources[;]

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the [ESA] * * *[;] [and]

(10) Whether the action threatens a violation of Federal, State,

> or local law or requirements imposed for the protection of
> the environment."

40 C.F.R. § 1508.27(b).

"Affecting" is defined in NEPA's implementing regulations to mean "will or may have an effect on." 40 C.F.R. § 1508.3

Plaintiff contends that the FONSI is arbitrary and capricious because four (4) of the ten (10) intensity factors "weigh in favor of a finding that the [] [P]roject will have a significant impact on the environment," (Plf. Mem. at 53), thus, requiring an EIS. Specifically, plaintiff contends that an EIS is required because: (1) that the Project will adversely affect the piping plover, see 40 C. F. R. § 1508.27(b)(9); (2) several impacts of the Project are uncertain or unknown, see id. § 1508.27(b)(5); (3) the Project is likely to "establish a precedent for future actions with significant effects," id. § 1508.27(b)(6); and (4) "it is 'reasonable to anticipate a cumulatively significant impact on the environment' from the [] [P]roject and other similar beach engineering projects in the area," (Plf. Mem. at 55) (quoting 40 C.F.R. § 1508.27(b)(7)).

An action is not necessarily "significant," thus requiring an EIS, whenever one (1) of the ten (10) intensity factors are met. To the contrary, "[w]hile the ten [intensity] factors may show that the [agency] *could have* prepared an [EIS], they do not show that the [agency] acted arbitrarily and capriciously in not completing one." Klein v. U.S. Dep't of Energy, 753 F.3d 576, 584 (6th Cir. 2014) (emphasis in original); see also Coliseum Square Ass'n, Inc. v. Jackson, 465 F.3d 215, 240 (5th Cir. 2006) ("[T]he listed factors do not constitute categorical rules such that their presence or absence means an impact is *per se* significant.") But see Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846, 865 (9th Cir. 2005) ("[O]ne of the[] factors may be sufficient to require preparation of an EIS in appropriate circumstances.")

The Army Corps completed a thorough EA of the Project, considered all of the environmental effects mentioned in the intensity factors, and reasonably described the environmental impacts it finds to be "not significant" and NEPA "requires no more." Klein, 753 F.3d at 585; see also Coliseum Square, 465 F.3d at 240 (holding that as long as the agency has addressed and reasonably evaluated each intensity factor, it has complied with NEPA).

Moreover, as set forth above, the Army Corps's analysis of cumulative impacts in the EA is adequate and, thus, plaintiff cannot demonstrate that that intensity factor, 40 C.F.R. § 1508.27(7), requires an EIS. Moreover, since the EA was developed "to address the particular circumstances and problems encountered in and around [Fire Island]," Town of Cave Creek, Ariz. v. Fed. Aviation Admin., 325 F.3d 320, 332 (D.C. Cir. 2003), it creates no binding precedent. See, e.g. Barnes v. U.S. Dep't of Transp., 655 F.3d 1124, 1140 (9th Cir. 2011) ("EAS are usually highly specific to the project and locale, thus creating no binding precedent."); Town of Cave Creek, 325 F.3d at 332 (finding that approval of the project created no binding precedent, as it was developed "to address the particular circumstances and problems encountered in and around [the Project area].")

Furthermore, the "regulations do not anticipate the need for an EIS anytime there is some uncertainty, but only if the effects of the project are 'highly' uncertain." In Defense of Animals, Dreamcatcher Wild Horse and Burro Sanctuary v. U.S. Dep't of Interior, 751 F.3d 1054, 1070 (9th Cir. 2014). Plaintiff does not allege, much less demonstrate, that the effects of the Project are "highly uncertain," only that "several impacts" and the cumulative impacts of several other projects in the area are "uncertain." (Plf. Mem. at 53). Under the circumstances of this case, the uncertainty of some of the Project's effects, alone, is insufficient to require an EIS. See, e.g.

82

Greater Yellowstone Coal. v. Flowers, 359 F.3d 1257, 1276 (10th Cir. 2004) (finding that where the uncertainty of the effects of the project were due to the unpredictability of, *inter alia*, the species, as opposed to a "lack of thoroughness in investigating potential impacts," "further assessment of impacts in an EIS before the project's implementation is unlikely to be productive").

In addition, "NEPA regulations direct the agency to consider the degree of adverse effect on a species, not the impact on individuals of that species." Environmental Prot. Info. Ctr. v. U.S. Forest Serv. 451 F.3d 1005, 1010-11 (9th Cir. 2006). Therefore, although the Project may effect individual pairs of piping plover, estimated by the FWS to be approximately one (1) pair per year of the Project, it was not arbitrary and capricious for the Army Corps to find that the Project will not cause a significant adverse effect on the species, particularly in light of the nondiscretionary conservation measures provided in the EA.

"When the adequacy of proposed mitigation measures is supported by substantial evidence, the agency may use those measures as a mechanism to reduce environmental impacts below the level of significance that would require an EIS." Hoffman, 132 F.3d at 17; see also Friends of Ompompanoosuc, 968 F.2d at 1556-57. "[M]itigation measures have been found to be sufficiently supported when based on studies conducted by the agency, * * * or when they are likely to be adequately policed * * *." Hoffman, 132 F.3d at 17 (citations omitted).

Since the mitigation measures in the EA are nondiscretionary and include, *inter alia*, a program to monitor and ensure their effectiveness, they are supported by substantial evidence.[20]

---

[20]  Moreover, the Biological Opinion requires the Army Corps to cease operations and reinitiate consultation to review those measures, and the need for their possible modification, in the event the level of incidental take is exceeded.

See, e.g. Hoffman, 132 F.3d at 17 ("[H]ad [the mitigation measure] included a program to monitor and ensure its effectiveness, there would then have been substantial evidence to support it."); Abenaki Nation of Mississquoi v. Hughes, 805 F. Supp. 234, 239 n. 9 (D. Vt. 1992), aff'd, 990 F.2d 729 (2d Cir. 1993) (finding the efficacy of the proposed mitigation measures to be assured because they were included as mandatory conditions and they required the implementation of a detailed plan to monitor the effects of the proposed action; the monitoring of the mitigation efforts to ensure their effectiveness; and the implementation of an alternative plan should the proposed mitigation efforts not be effective); Pogliani, 2007 WL 983549, at * 16 (accord). Accordingly, the Army Corps properly relied upon those measures in reducing the environmental impacts of the Project below the level of significance and issuing a FONSI. Since plaintiff has not demonstrated "that there is a substantial possibility that the [Project, including the mitigation measures] may have a significant impact on the environment * * *[,]" Hoffman, 132 F.3d at 18, it has not demonstrated a likelihood of success on the merits of its APA claim against the Army Corps challenging its issuance of a FONSI.[21]

---

[21] Since plaintiff has not demonstrated a likelihood of success on the merits of any of its claims against defendants, it is unnecessary to consider the "irreparable injury" and "public interest" prongs of a preliminary injunction motion. In light of this determination: (1) defendants' motion pursuant to Rule 65(b)(4) to dissolve the TRO is denied as moot, since the TRO expires by operation of law upon determination of the motion for a preliminary injunction; (2) plaintiff's cross motion to strike certain paragraphs and exhibits of the Amanat declaration is likewise denied as moot; and (3) the FILPS's motion for leave to file a brief amicus curiae is denied, since its proposed brief addresses only the "balance of hardships" prong, which is inapplicable to this case, see Otoe-Missouria Tribe, — F.3d —, 2014 WL 4900363, and the "public interest" prong, which is unnecessary to consider, of a motion for a preliminary injunction.

III.  CONCLUSION

For the foregoing reasons, plaintiff's motion for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure is denied; defendants' motion pursuant to Rule 65(b)(4) to dissolve the TRO is denied and plaintiff's cross motion to strike certain paragraphs and exhibits of the Amanat declaration are denied as moot; and FILPS's motion for leave to file a brief amicus curiae is denied.

SO ORDERED.

s/ Sandra J. Feuerstein

Sandra J. Feuerstein
United States District Judge

Dated: October 17, 2014
        Central Islip, New York